COMMONWEALTH *vs.* WILLIAM MORRILL GILDAY, JR.

Suffolk.   November 3, 1980. — December 31, 1980.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* New trial, Disclosure of evidence, Suppression of evidence by prosecutor. *Error,* Harmless. *Due Process of Law,* Disclosure of evidence.

A criminal defendant's motion for a new trial, based on the Commonwealth's failure to disclose to the defense the contents of three documents, allegedly in the Commonwealth's possession at the time of trial and exculpatory of the defendant, was properly denied in the absence of a showing that any of the documents was in the Commonwealth's possession at the time of trial. [173-174]

Where the prosecutor at the trial of indictments for first degree murder and armed robbery entered into an arrangement with the attorney for a witness introduced by the prosecution whereby the witness's "cooperation would be made known to the Court" with a view to favorable disposition of charges against him, and the witness, although not informed of the arrangement, was advised by his attorney that it would be "in his best interests to testify in the case," the prosecutor's failure to disclose the arrangement to the defense in response to a request for information as to any such arrangement, especially after the witness's denial on cross-examination that any arrangement had been made, was a breach of his duty of disclosure [174-178]; however, the nondisclosure was harmless beyond a reasonable doubt in view of the overwhelming evidence of the defendant's guilt, including admissions in his own testimony [178-180].

MOTION for a new trial filed in the Superior Court Department on January 11, 1979.

The proceeding was heard by *McGuire,* J.

*William M. Kunstler* of New York (*Barry P. Wilson* with him) for the defendant.

*Jeremiah P. Sullivan,* Assistant District Attorney (*Carol Anne Fagan,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J. The defendant William Morrill Gilday, Jr., was convicted, after a jury trial, on an indictment for murder in the first degree of a Boston police officer, and on two indictments for armed robbery. Concurrent life sentences were ultimately imposed on all convictions.[1] On appeal, this court affirmed the convictions. *Commonwealth* v. *Gilday*, 367 Mass. 474 (1975). Gilday is now here on appeal from the denial by a Superior Court judge of a motion for a new trial. We affirm the judge's order denying the motion.

During oral argument, Gilday's attorney stated to this court that copies of two reports of the Federal Bureau of Investigation, assertedly exculpatory of Gilday, had come into Gilday's possession at some time after the hearing on the motion for a new trial had been completed. At defense counsel's request we remanded the case to the Superior Court motion judge for further consideration of the motion for a new trial in light of the two documents. The judge made further findings and rulings, and reaffirmed his denial of the motion.

We summarize the relevant facts, as excerpted from our opinion in *Commonwealth* v. *Gilday*, 367 Mass. 474, 477-485 (1975). The defendant was indicted on murder and robbery charges on October 1, 1970, along with Stanley R. Bond, Robert J. Valeri, Susan E. Saxe and Katherine A. Power. The victim of the murder was Boston police Officer Walter A. Schroeder, who was shot in the course of the armed robbery of the Brighton branch of the State Street Bank and Trust Company on September 23, 1970. The Commonwealth's evidence showed, in general, that Bond, Valeri and Saxe entered the bank carrying guns, robbed it and drove off in a blue Chevrolet automobile; that Gilday, armed with a semiautomatic rifle, was seated in a white Nash Ambassador automobile across the street from the bank; that after the other three had escaped from the scene,

---

[1] The defendant initially was sentenced to death on the murder charge, but upon a motion for new trial filed after *Furman* v. *Georgia*, 408 U.S. 238 (1972), this was reduced to life imprisonment. See *Commonwealth* v. *Gilday*, 367 Mass. 474, 476 (1975).

Gilday fired a number of shots at two policemen who arrived, and Officer Schroeder thereby sustained the wounds from which he died the next day. Bond, Valeri, and Saxe later switched to a third vehicle, a station wagon driven by Power, and made their escape. Gilday also escaped, in the white Ambassador.

The witness Francis Goddard testified that he had seen a man firing at the bank, and his testimony as to the man's description was consistent with the defendant's appearance. The witness Bernard Becker identified Gilday before the jury as the man who fired the rifle at the bank on the day in question. The witness Andrew Gaudette testified that he saw a man in a white sedan firing a weapon toward the bank, and that he had identified a photograph of Gilday, among a group of photographs shown to the witness, as the man who fired the gun. Gaudette failed to identify Gilday before the jury, at a time when Gilday was seated among the spectators in the court room.

The witness James A. Fox, a licensed firearms dealer in New Hampshire, testified that he had sold a .45 caliber semiautomatic rifle, and other weapons, to the defendant on September 5, 1970, and that the defendant was accompanied by Bond. The defendant and Bond fired test rounds from the weapon into a sandbank. He identified a semiautomatic rifle, which had been found in Bond's luggage at the time of Bond's arrest in Colorado after the murder and robbery, as the one he sold to the defendant. A ballistics expert testified that bullets and spent casings recovered from the New Hampshire sandbank, from the police car of Officer Schroeder, from in and around the Brighton bank, and from the area where the white Ambassador had been, all were fired from the semiautomatic rifle in evidence that had been sold to Gilday and later found in Bond's luggage.

The blue Chevrolet, which had been used by Bond, Saxe, and Valeri in the robbery, was recovered by the police. It was shown that an Ontario license plate on the vehicle had been stolen from a vehicle in the parking lot of the Hunting-

ton Avenue Y.M.C.A. in Boston where Gilday at the time lived. Gilday's thumb print was found on the license plate.

Alan McGrory testified that about 2:30 P.M. the day of the robbery and murder, the defendant came to McGrory's room. Bond was outside on the street, casually talking to a driver in a taxicab. At that time the witness McGrory said to Gilday, "I was sick to hear that two guys and a girl and an old reprobate had robbed a bank and critically wounded a police officer." Gilday answered that he had not heard about it. Then the two tried to get the news on the radio without success. Gilday then said that he did not think the officer was going to die, and that, even if the officer did die, he, Gilday, had nothing to lose. Gilday warned McGrory that even if Gilday were imprisoned on death row, he would take care of McGrory if he said anything. At this point Gilday gave the witness some money from a large roll of bills, and asked the witness whether he would be ready to leave that afternoon for the west coast. Gilday offered to get the witness a gun.

Robert J. Valeri testified that plans were made that Saxe, Bond, and Gilday were to enter the bank, and Valeri was to stay outside, but the following morning Gilday asked Valeri to go in while Gilday remained outside. Bond was to carry a 9 mm. Browning; Gilday, a shotgun and a .38 caliber pistol; Saxe, a .30 caliber carbine and pistol; and Valeri, a semiautomatic weapon and a .357 Magnum, but the plans were changed, and Gilday took the semiautomatic weapon, and he, Valeri, took the shotgun. According to Valeri's testimony, plans were made for Bond, Saxe, and Valeri to use the blue Chevrolet; Gilday was to have the white Ambassador; and Power was to use a 1961 or 1962 Ford station wagon, which Gilday had purchased. The witness testified that he stole the blue Chevrolet in Springfield, Massachusetts, and that just before leaving for the robbery Gilday changed the plates and put on the Ontario plate. The witness testified that he had seen the semiautomatic weapon prior to September 23, and Gilday told him that he and Bond had bought the weapon in New Hampshire.

Valeri further stated that, when they left the Beacon Street area, Bond was driving the blue Chevrolet, Gilday the white Ambassador, and he, Valeri, was driving the station wagon; that, on a side street, Power took the station wagon as the switch car, and he, Valeri, joined Bond and Saxe in the Chevrolet; that the two vehicles proceeded to the bank, and Gilday took his position in the white Ambassador with the New Jersey plates, on Western Avenue near the corner of Everett Street; that he, Valeri, Bond, and Saxe entered the bank, and when the tellers were slow in giving up the money, Bond fired two quick shots in the bank; that Bond took the money in bags, and they left the bank; that they drove from the bank, met Power, abandoned the Chevrolet, and drove away in the Ford station wagon, with Bond and himself lying in the back under a rug.  The witness said he was dropped at Roberts station in Waltham from where he took a train to North Station, Boston, and proceeded to 163 Beacon Street.  When he arrived, Bond and one Michael Fleischer were present and Power and Saxe later returned.  Gilday came in after the women, and he had with him a suitcase containing the semiautomatic weapon.  Bond asked Gilday what had happened, and Gilday said he stayed there and waited, and when the police officer came, he opened fire on him, and Bond and Valeri asked why he, Gilday, had waited, and Gilday said that "he had always wanted to shoot a police officer."

Stanley R. Bond testified that he was present when Gilday purchased the semiautomatic weapon, with other guns; and that he and Gilday bought the Ford station wagon. Bond stated that Gilday had stolen license plates for the group, one of which was used in the State Street Bank holdup, but the witness was not sure on which car the plate had been used.  Bond also testified that he thought he drove the blue Chevrolet, that Fleischer drove the white Nash, and that Power drove the station wagon.  At one point, the witness said, "Mike had pulled up across the street."  They drove around the bank.  Saxe then went into the bank to see if the vault was open.  After she returned to them, they

parked the car and Bond, Saxe, and Valeri entered the bank together. Bond took the guard's gun. When the tellers hesitated, he fired one shot from his weapon. Bond and the others took the money in bags and left. They drove to the switch car site, joined Power, then dropped Power off on Route 9, and Valeri in Waltham. The witness Bond left the station wagon in Waltham, and took a cab back to the apartment on Beacon Street. When he arrived, Power was there and told him a "cop" had been shot. Saxe returned, then Valeri, and finally the defendant Gilday and Fleischer arrived at the same time. Later that evening, Bond drove Gilday to Brandeis University and told him to drive the station wagon somewhere, and he gave Gilday $1,000. Bond testified that he and Power left Boston by car; that Saxe and Fleischer went to the Logan airport; and that the four were together again in Philadelphia.

Bond further testified that he was sure that Gilday knew that he, Bond, was involved in robbing banks and in other activities, and that Gilday had participated in a breaking and entering of the Newburyport armory together with himself, Saxe, Power, and Valeri. The witness testified that he did not see Gilday on September 23, 1970, until after noon, and that Gilday must have put the Ontario plate on the blue Chevrolet the night before and that, when he saw Gilday at noon, Gilday was drunk.

The defendant testified and admitted that he knew Bond and that he had bought the semiautomatic weapon, but he claimed that he was sick from drinking at the time. Gilday acknowledged that he was a frequent visitor with Bond, Valeri, Saxe, Power and Fleischer at the Beacon Street apartments, and admitted he had been carrying a gun on his person from about September 16, 1970. He further stated that he had stolen the Ontario plate and that he had purchased the Ford station wagon, the sale being made in the name of one Sheldon Gelman, as Bond had identification papers for Sheldon Gelman. The defendant testified that on September 20, 1970, he had driven Kathy Power to the armory at Newburyport and waited nearby, but he as-

serted that he was drunk at the time and had fallen asleep in the back seat and only later learned that Bond, Valeri, and Saxe had obtained radios and other material from the armory. The defendant admitted, however, that he had shown them a circuitous route from Newburyport to Boston.

The defendant also testified that he knew the witness McGrory; that on the evening of September 22, 1970, he was at 337 Beacon Street, and knew that Bond, Valeri, and two women were planning something, but did not know exactly what; that he saw McGrory with Bond and Valeri, and further verified substantially what McGrory had stated; that, after the meeting with McGrory, he returned to his room at the Y.M.C.A. at which time he slept, awakening about 7 A.M. on September 23, the day of the robbery. Gilday stated that on that morning he had taken a few drinks, went to downtown Boston for some shopping, visited a political headquarters, and registered to vote at a booth on Boston Common shortly after 11 A.M. According to Gilday's testimony he then went to Northeastern University. Unable to operate the elevator at the university, he went to Dean Garland at the school about 12:30 P.M. to get a key. He visited another bar and heard news reports of the holdup and first went to 337 Beacon Street. He then went to the other apartment where Bond, Saxe, Power, and Fleischer were "yelling and hollering" and charging each other with things, and he took some of the holdup money and left. The defendant further testified that he went to pick up some clothes that had previously been purchased, then went for more drinks. He testified, although not entirely certain of the sequence of events, that he then revisited Bond, finally returning to the Y.M.C.A. where Bond picked him up and drove him to Waltham to get the station wagon. At this point Bond gave him $1,000, but, although he asked Bond to take him with him, Bond refused.

In rebuttal, Michael Fleischer testified that he knew Bond, Saxe, Power, and Valeri, and met Gilday in September, 1970; that he was in sympathy with aims to change

society, but did not agree with Bond's plan to rob banks to finance a general uprising; that on September 22, 1970, he heard a discussion among the five concerning the robbery of a bank on September 23, 1970; that he saw many guns in the apartment at 337 Beacon Street; and that he helped the five load things into the three cars, and he then went back to the apartment at 163 Beacon Street. The witness testified Power returned first, then Bond and Valeri. Gilday arrived approximately fifteen minutes later, and finally Saxe returned. There was a discussion about shooting the "cop," and Saxe and Power accused Gilday of being "trigger-happy" and said that it was "a real stupid thing to do to shoot the cop," and Gilday said, "What did you want me to do, the cop was right there, he was only thirty seconds behind you."

1. Gilday argues that he is entitled to a new trial because the Commonwealth failed to make known to the defense, at or before the trial, the contents of three documents which allegedly were in the Commonwealth's possession and were exculpatory of Gilday. The first of these documents is an FBI report, taken the day after the crimes, wherein the witness Michael Fleischer denied knowing Gilday. The motion judge denied the defendant's motion for a new trial based on this first FBI report. At oral argument before this court, Gilday asserted that two additional FBI reports recently discovered by him were in the possession of the Commonwealth at the time of Gilday's trial; that they were exculpatory of Gilday; and that the Commonwealth failed to make them available to Gilday before or during his trial. One of these two reports states that an eyewitness to the crime, Bernard Becker, who testified at the trial and identified Gilday as firing a rifle at the scene of the robbery, could provide no description of the man who fired the shots. The other report refers to the possible grant of immunity to the witness Fleischer.

This court remanded the case to the motion judge for his findings and rulings as to these two additional documents. The judge complied, and we now have in the record his ad-

ditional findings and rulings. The judge declined to grant a new trial by reason of Gilday's argument as to the two additional documents.

There is no error in the judge's rulings upon the three documents. The short answer to Gilday's arguments as to the significance of these papers lies in the judge's findings that no showing was made that any of the documents was in the Commonwealth's possession at the time of the trial.[2]

2. Gilday's principal argument asserts that the motion judge erred in not granting a new trial because the prosecutor had offered the witness Michael Fleischer favorable consideration in exchange for his testimony. Fleischer had denied any such arrangement when he was cross-examined on the issue, and the prosecutor, Mr. John Gaffney, had at the same time remained silent.

The prosecution had rested its case, and Gilday had rested his defense after he and his alleged accomplice Stanley R. Bond had testified. Fleischer was then called by the prosecution as a rebuttal witness. His testimony, summarized above, included his account of a discussion, before the date of the robbery and murder, between Gilday, Bond, Saxe, Power and Valeri, concerning the robbery of a bank on September 23, 1970. He also told of a discussion, shortly after the robbery, about shooting the "cop," and Saxe and Power accused Gilday of being "trigger-happy" and said that it was "a real stupid thing to do to shoot the cop," and Gilday said, "What did you want me to do, the cop was right there, he was only thirty seconds behind you."

Prior to Fleischer's appearance on the stand, Gilday's attorney specifically asked the prosecutor whether a "deal" had been made with the witness and was informed by both the trial judge and the prosecutor that "you can cross-examine Fleischer on it," and "you're entitled to cross-exam-

---

[2] Even had the defendant managed to prove that the documents were in the Commonwealth's possession at the time of trial, the harmless error doctrine would be dispositive of the defendant's claim for relief, just as it disposes of the defendant's principal assertion of error, *infra*.

ine." However, Fleischer in cross-examination specifically denied that any deals had been made or that any promises had been made to him by the Commonwealth other than one to "ask for high bail but not demand it," if he would give a statement to the Boston police department. The prosecutor, Mr. Gaffney, did nothing to correct this testimony.

The motion judge in the instant proceeding found that Mr. Gaffney, without reaching a formal agreement with Fleischer's attorney, told that attorney before trial that he, Mr. Gaffney, "would do everything [he] could to bring it to the Court's attention, the fact that [Fleischer] had cooperated in giving a statement to the police and that if [Fleischer] did testify that that cooperation would also be made known to the Court so that a disposition could be made of his case which would not leave him with a criminal record."[3] However, the judge also found that, consistent with the agreement between the prosecutor and Fleischer's attorney, Fleischer was unaware of this arrangement; Fleischer was told by his attorney only that it would be "in his best interest to testify in the case."[4]

Gilday argues correctly that, under *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), the prosecution has the obligation to turn over exculpatory evidence to the defense provided the evidence is material. This principle has been applied to require the prosecution to reveal to a defendant any understanding or agreement between the government and a key government witness. E.g., *Giglio* v. *United States*, 405

---

[3] This finding is in the precise words which the prosecutor inserted in the record of the trial of Susan Saxe, several years after the Gilday trial, when Saxe raised the issue of the arrangement with Fleischer.

[4] The judge also found that "the jury knew what Fleischer knew," and he cited *Commonwealth* v. *Lombardo*, 2 Mass. App. Ct. 667, 673 (1974), for the principle that the jury need not be given more information than the witness himself actually possesses. From this finding, the Commonwealth argues, inter alia, that there was no arrangement or agreement which put a duty of disclosure upon the prosecutor. As seen, *infra*, we disagree with this argument.

U.S. 150, 154-155 (1972). See *United States* v. *Agurs*, 427 U.S. 97, 106-112 (1976); *Commonwealth* v. *Haywood*, 377 Mass. 755, 759 n.4 (1979); *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978).

In this case there was a general *Brady* type motion by the defense before trial and, early in the trial, an oral request for information as to any arrangement between Fleischer and the prosecution. There was no such disclosure by the prosecution, and the prosecutor was also silent when Fleischer made his denial. Gilday contends that Fleischer perjured himself and the prosecutor knew it. From these factors Gilday argues that *Giglio* and *Agurs* mandate a new trial here. However, it is clear that the motion judge found no perjury. It is also clear that such a finding would not have been warranted on the evidence, since there was no evidence that the witness had knowledge of any deal or arrangement. Nevertheless, Gilday argues in the alternative that even without proof of intentional falsehood, the principle of *Giglio* and *Agurs* applies because the jury were left with a false impression and the prosecutor, knowing that to be the case, remained silent. Gilday relies here upon such cases as *United States* v. *Harris*, 498 F.2d 1164 (3d Cir.), cert. denied sub nom. *Young* v. *United States*, 419 U.S. 1069 (1974), and *Burkhalter* v. *Texas*, 493 S.W.2d 214 (Tex. Crim. App.), cert. denied, 414 U.S. 1000 (1973). "Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* [*Napue* v. *Illinois*, 360 U.S. 264 (1959)] require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading." *United States* v. *Harris*, *supra* at 1169.

We do not here adopt the generality of the language of the *Harris* opinion and the ambiguity of a general rule which speaks to "false impressions." Nevertheless, we think the particular circumstances of this case put upon the prosecutor, Mr. Gaffney, a duty to make seasonable disclosure to the defense and the trial judge. The prosecutor knew he had made a specific arrangement with Fleischer's attorney for favorable consideration for Fleischer. Although the at-

torney had agreed not to tell Fleischer of the arrangement, the implications of Fleischer's cooperation with the Commonwealth should have been clear to the prosecutor. The prosecutor, from common experience, was chargeable with knowledge that Fleischer testified with expectations of leniency. The reality of this conclusion is later supported by the evidence at the hearing on the motion for a new trial, when it was shown that Fleischer had been told by his attorney that it would be "in his best interests to testify in the case." This advice by Fleischer's attorney, as well as Fleischer's knowledge of the conference between his attorney and the prosecutor, were facts that the defense was entitled to explore on cross-examination, since they were pertinent to the issues of bias and credibility of the witness. Given the circumstances of this case, the prosecutor was not excused from his duty of disclosure by the lack of a formal agreement with the witness, nor is it dispositive that Fleischer was less than fully informed of any benefit to be gained. See *Commonwealth* v. *Haywood,* 377 Mass. 755, 759 n.4 (1979). If we failed to reach these conclusions on the facts of this case, we would in effect approve the evasion of the *Giglio* rule by means of artful device.

The motion judge based his denial of the motion on his conclusion that the prosecutor's failure to disclose did not influence the jury so as to require a new trial. We turn now to that issue.

The Supreme Court has described three situations in which due process may be violated, requiring a new trial, because of the prosecution's suppression of material evidence favorable to the defendant. *United States* v. *Agurs,* 427 U.S. 97, 103-107 (1976). First, where there has been intentional introduction of false testimony, or the prosecutor has remained silent when he knew the witness had perjured himself in denying an arrangement with the prosecutor, a strict standard of materiality is applied. In this situation, a conviction is invalid if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103 & n.9. The second situa-

tion involves a defendant's specific and relevant request for exculpatory evidence. The prosecutor's failure to respond to such a request "is seldom, if ever, excusable." *Id.* at 106.[5] Although there was no showing of perjury here, there was a specific and relevant request by the defense. Even applying the most stringent standard, however, we, like the motion judge, conclude that Gilday is entitled to no relief. "We appreciate that we should apply the principle of harmless error with restraint, particularly in the face of asserted constitutional error. The peril to the defendant's rights is obvious in any process wherein the appellate court speculates, long after the fact, as to the jury's reasoning if the case as presented before them had been different." *Commonwealth* v. *Gilday*, 367 Mass. 474, 498-499 (1975). Relief should be denied only when constitutional error is harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U.S. 18, 24 (1967). We should set aside the conviction unless we are "sure that the error did not influence the jury, or had but very slight effect." *Agurs, supra* at 112, quoting from *Kotteakos* v. *United States*, 328 U.S. 750, 764 (1946).

Applying these strictest of principles, we conclude that the suppression of exculpatory information here was harmless beyond a reasonable doubt. The evidence was overwhelming that Gilday was involved in the robbery and fired the fatal shots. Two eyewitnesses (Goddard and Gaudette) testified to that effect. The accomplice Valeri placed Gilday at the scene of the robbery in the automobile (the white Ambassador) from which the shots were fired, placed the murder weapon in Gilday's possession after the robbery, and testified to Gilday's statement that "he had always wanted to shoot a police officer." McGrory testified to ad-

---

[5] The third situation, not present in this case, arises when there is no request by the defendant for exculpatory information, or merely a general request. *United States* v. *Agurs*, 427 U.S. at 106-107. In that situation, the Supreme Court adopted the following standard of materiality: "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed," requiring a new trial. *Id.* at 112.

missions made by Gilday after the robbery and murder. The witness Fox testified it was Gilday who purchased the gun which was shown, by ballistics evidence, to be the murder weapon. There was testimony that Gilday stole an Ontario license plate and affixed it to the Chevrolet used by Bond, Saxe and Valeri in the robbery; Gilday's thumb print was found on the license plate.

In the face of this and other significant evidence, it is not reasonable to think that disclosure to the jury that Fleischer was aware of a favorable "deal" in his behalf would have changed the verdict of the jury. Fleischer's testimony, although it included attribution to Gilday of admissions that he killed the policeman, was at best cumulative of other similar evidence, and less detailed and damaging to Gilday than the testimony of others. It is true that Gilday and the witness introduced by him (Bond) testified that Gilday was not at the scene of the robbery. However, the jury had the privilege of disbelieving their testimony on that issue. At the same time the jury could consider the extensive proof of Gilday's involvement, including the testimony by Bond and the admissions by Gilday in his testimony, as supportive of the Commonwealth's contention that Gilday fired the fatal shots.

An additional argument by Gilday is that he should have a new trial, not only because he was deprived of a fair trial, but also for the prophylactic effect of discouraging similar future breaches of the *Brady* and *Giglio* principles. Although this argument has some merit, our concern is not to punish the prosecutor, but rather to avoid an unfair trial to the accused. Cf. *Burkhalter* v. *Texas*, 493 S.W.2d 214, 218 (Tex. Crim. App.), cert. denied, 414 U.S. 1000 (1973). On that score, the harmless error doctrine is dispositive here.

If we had any doubt about applying the principle of harmless error here, that doubt would be entirely eradicated by consideration of Gilday's testimony at the trial.[6] In

---

[6] It cannot be argued that the weight of Fleischer's testimony had anything to do with Gilday's decision to testify, since Fleischer testified in rebuttal, after Gilday testified.

our prior Gilday opinion we said: "The admissions of the defendant on the witness stand would have been even more extraordinary if the Commonwealth had chosen to proceed on proof that the defendant was an accessory before the fact. See G. L. c. 274, § 3, which provides that an accessory before the fact may be indicted, convicted and punished as a principal to the substantive felony. Among other things, the defendant testified that he procured the guns and an automobile that were used in the bank robbery; that he stole a license plate and affixed it to another of the vehicles used in the robbery; that he disposed of one of the vehicles after the robbery; that he took a substantial share of the loot; and that he knew Bond, Valeri, [Power, and Saxe] were planning something but did not know exactly what." *Commonwealth* v. *Gilday,* 367 Mass. 474, 499 n.4 (1975).

This case concerns the cold-blooded killing of a police officer. There was overwhelming evidence that Gilday committed the murder, including his extraordinary statements on the witness stand. The granting of a new trial here would be a miscarriage of justice.

*Order denying motion for
new trial affirmed.*