COMMONWEALTH vs. VINCENT FRANCIS COLLINS.

Hampden. December 8, 1981. — April 29, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Discovery, Suppression of evidence by prosecutor, Argument by prosecutor. *Witness,* Impeachment.

Where the prosecutor at the trial of indictments charging robbery and murder in the first degree failed to disclose to the jury an outstanding pretrial offer to the key prosecution witness to recommend acceptance of the witness's plea of guilty to a charge of murder in the second degree, which arose out of the same events, and where the prosecutor indicated in his closing argument that there was nothing he or the Commonwealth could do for the witness, the defendant was entitled to a new trial, even though the Commonwealth's offer to accept the guilty plea was not conditioned on the witness's testimony against the defendant. [8-15] HENNESSEY, C.J., dissenting.

INDICTMENTS found and returned in the Superior Court on October 22, 1975.

The cases were tried before *Abrams,* J., and a motion for a new trial was heard by *Mulkern,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Steven J. Rappaport* for the defendant.

*John T. McDonough,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. On April 28, 1976, a Hampden County jury convicted the defendant of robbery and murder in the first degree. He was sentenced to concurrent terms of life imprisonment, and his claim of appeal was entered on April 29, 1976. Subsequently, the defendant's appointed trial counsel was replaced by a succession of three appointed counsel, the first two of whom in turn filed motions for a new trial. The second motion was heard in June, 1979. Prior to that, the defendant's appeal of his convictions had been ordered dismissed, for want of prosecution, by a judge of the Superior Court. G. L. c. 278, § 33F, repealed by St. 1979, c. 346, § 3.

The motion for a new trial was denied on January 2, 1980, whereupon the defendant filed a notice of appeal. The matter was entered in the Appeals Court. Subsequently, the defendant's third and present posttrial counsel filed a motion in the Superior Court to vacate the order dismissing the appeal of the convictions. The motion was granted on May 20, 1981. This appeal was also docketed in the Appeals Court. We ordered the appeals both from the denial of the motion for a new trial and from the convictions transferred to this court.

Since the defendant has never had an appeal from his convictions, both appeals are properly before us. G. L. c. 278, § 33E. *Commonwealth* v. *Bertrand,* 385 Mass. 356 (1982). Both appeals raise the same issue — whether the Commonwealth improperly suppressed evidence of an arrangement with the key witness against the defendant at trial. We have reviewed the entire record of the defendant's trial as well as the transcripts and exhibits from the motion for a new trial. We conclude that the convictions must be reversed.

There was evidence of the following facts. In the early morning hours of July 9, 1975, a gasoline service station in Springfield was robbed. The attendant was shot to death. A Springfield police officer, responding to a call at 5:45

A.M., arrived at the station shortly thereafter and found the body of the victim, Jeffrey McCarl. The victim had been killed by two gunshot wounds to the back of his head. Bullet fragments recovered from his body and cartridge casings found nearby indicated that the murder weapon was a .22 caliber firearm. The cash register had been robbed of approximately $147, and the victim's wallet was missing.

Some weeks later, a patient in the Central State Hospital in Louisville, Kentucky, one Samuel Hunt, advised police in that city that he desired to confess a crime. On August 3, 1975, in the presence of two homicide detectives, Hunt, who was nineteen years old at the time, made a written confession. In it he recited, with marked familiarity, the details of the robbery and murder in Springfield. According to this confession, Hunt was the sole perpetrator of the crime.

Hunt was returned to Massachusetts by two Springfield detectives. When he arrived, he was brought to the gasoline station, where he re-created the crime for the officers. On August 5, 1975, he gave Springfield police a second written confession, which included details of the crime similar to those in the first statement. As in the earlier document, Hunt made no mention of any other person's being involved.

Hunt was indicted and sent to Bridgewater State Hospital for observation. G. L. c. 123, § 15 (b). In October, 1975, Hunt, acting under what he claimed was divine guidance, implicated the defendant Collins. This was the first knowledge that Springfield authorities had of the involvement of any person other than Hunt in the events of July 9. The defendant was indicted shortly thereafter.

Hunt was the key prosecution witness at the defendant's trial. The prosecutor informed the jury in his opening remarks that "we will have Mr. Hunt here to testify. I will tell you now that he is a co-defendant and he faces similar charges that are here being faced by Mr. Collins. They are not, and the evidence will show, that they have not been disposed of at this point." When Hunt was called, the judge held a voir dire on the question of his waiver of the

right against self-incrimination. Hunt was questioned by both his special counsel and the judge.[1] Hunt claimed that he had made no arrangements with the prosecutor in return for his testimony. Furthermore, he stated he understood that, by his testimony at trial, he was exposing himself to an almost certain conviction of murder in the first degree. He was then allowed to give testimony before the jury.

In response to one of the first questions put to him before the jury, Hunt denied having had any prior discussion of the case with the assistant district attorney, Mr. Gibbons. He testified that on July 7, 1975, he had been hitchhiking outside Nashville, Tennessee, when the defendant stopped and picked him up. The defendant was driving a yellow Datsun truck at the time. The two drove northeast, stopping first in Connecticut. From there they drove to Springfield and stopped near the service station at approximately 4:30 A.M. on July 9.

Hunt testified that the two alighted from the truck and walked toward the station while the defendant tucked a gun in his belt. From that point Hunt's trial testimony tracked his confessions except, of course, that his role of observer now overshadowed that of participant. In all accounts, what transpired was the cold-blooded execution of a nonresisting robbery victim. In Hunt's account at trial, Collins murdered the attendant after relieving him of the keys to the cash register. Hunt claimed that, before the killing, he took the wallet from the victim at the defendant's direction.[2]

The two men remained in Springfield for one night and then drove to Provincetown.[3] From there, in the company of a woman they had recently met, they drove to Vermont,

---

[1] Another attorney, Mr. Hurley, was in the courtroom during questioning. Mr. Hurley had been appointed to represent Hunt during the time prior to the appointment of special counsel.

[2] Hunt still had the wallet in his possession when he first met with Louisville police.

[3] The manager of a Provincetown motel testified that the defendant and Hunt registered for a room for two on July 10, 1975. She noted they arrived in a yellowish-orange Datsun truck with Connecticut license plates.

where the truck broke down in the early morning hours of July 12. A Vermont State trooper came upon the defendant while investigating a report of a disabled vehicle. After running a check on him on the National Crime Information Center computer, the officer arrested him on an outstanding warrant.[4] Hunt was brought to the station for investigation, but was released shortly thereafter. He returned to Louisville.

On cross-examination Hunt admitted making the two written confessions, which he claimed were lies.[5] At the same time he denied that his testimony against the defendant was given in exchange for leniency, although he admitted he hoped to receive lighter treatment.

The defendant called a witness who testified to Hunt's bias against the defendant. This same witness testified in voir dire that Hunt had told him he expected a lighter sentence in return for his testimony.[6] The defendant did not testify.

In his closing argument, the prosecutor told the jury that "[o]ne of the items [defendant's counsel] brought out was that Mr. Hunt has pleaded not guilty to the charges and is expecting some break. I can assure you from the testimony that Mr. Hunt has given in this case, I don't know what type of consideration that the Commonwealth could extend to him, but he is going to have to face the full impact of the law just on the testimony he has given here before you. And so there is nothing, nothing that I can do for him or the Commonwealth of Massachusetts can do for him. He is going to have to face the music. He has got to face a trial for this just as Mr. Collins has."

---

[4] The trooper testified that the defendant told him that he had picked up Hunt hitchhiking in the South. This same officer testified that no weapons were found in the truck. A rifle stock was found under the seat and gun oil was found in Collins's duffle bag.

[5] Hunt also admitted to a long history of depression and suicide attempts.

[6] Two other witnesses testified that Hunt had claimed sole responsibility for the robbery and the murder. One of these was the Springfield police officer who had accompanied Hunt during his re-creation of the crime at the gasoline station.

Subsequent to the defendant's conviction, Hunt offered to plead guilty to murder in the second degree. At a hearing on the matter, the judge asked whether any promises or offers of rewards had been made to Hunt for his plea. In response, the district attorney stated, "Your Honor, may the record indicate, of course from time to time, both Mr. Gibbons and I had suggested to Mr. Gordon [Hunt's special counsel] and also to the previous counsel [Mr. Hurley] that we would entertain a plea to second degree murder and reduce it from first to second; that is the only promise that was made." The plea was accepted, and the district attorney requested that the court recommend incarceration somewhere other than the Massachusetts Correctional Institution at Walpole, where Collins was confined.

Three months later Hunt's guilty plea was retracted. However, on November 10, 1976, Hunt again pleaded guilty to murder in the second degree. The plea was once again accepted and the district attorney requested that, out of appreciation for Hunt's testimony, any sentence imposed for the robbery be made concurrent with the sentence for murder.[7]

In June, 1979, Hunt testified at a hearing on Collins's motion for a new trial. He recanted his trial testimony and claimed that Collins was neither involved in the crime nor anywhere near the scene. Once again, he claimed sole responsibility for the robbery and the murder. Mr. Edward N. Hurley was called. He had represented Hunt in regard to the indictments which charged Hunt with murder in the first degree and armed robbery. On or about August 9, 1975, Mr. Hurley had spoken with the district attorney about a possible plea. At a time before his office was aware of Collins's alleged involvement, the district attorney informed Mr. Hurley that he would recommend a second degree murder sentence in exchange for a plea by Hunt. Mr.

---

[7] On February 24, 1978, Hunt appeared before the Superior Court on an unsuccessful motion to withdraw his guilty plea. In October of that year his application for transfer to the New Hampshire State prison was granted and he was transferred there.

Hurley had made this fact known to Hunt.[8]  In October, Mr. Hurley had attempted to negotiate a manslaughter plea in exchange for "an additional phase of the case uncovered," but the district attorney had refused to consider a lower plea.  Despite this, Hunt met with Springfield detectives that month and implicated Collins.

When the closing remarks of Assistant District Attorney Gibbons, the prosecutor at the Collins trial, were read to him, Mr. Hurley confirmed that, despite Gibbons's assertions to the contrary, both he and Hunt were aware, as of August, 1975, that he was going to be able to plead to murder in the second degree.  This plea was not, he claimed, conditioned upon Hunt's testimony against Collins because, at the time the offer was made, there was no expectation that Hunt would testify against anyone.

*Findings and rulings on the motion for a new trial.* Among the findings and rulings issued by the judge who denied the motion for a new trial are the following:  (1) The district attorney's pretrial offer to Hunt to recommend acceptance of Hunt's plea to murder in the second degree was not motivated by a desire to elicit additional information since, at that time, the district attorney had no knowledge of anyone else's participation in the crime.  The district attorney's offer had not been accepted by Hunt at the time of the defendant's trial.  (2) Hunt's implication of Collins was voluntary and was not motivated by a desire for leniency. (3) His recantation at the motion for new trial hearing, however, was false and was motivated by Hunt's concern for his well-being and by an animosity toward the Commonwealth.

The judge ruled that there was no nexus between Hunt's trial testimony and the prior recommendation of the district attorney.[9]  Thus, he reasoned that there was no evidence of

---

[8] After Mr. Hurley affirmed that he had made the fact of the offer known to Hunt, the assistant district attorney asked, "So at that point, he [Hunt] knew that the most to be faced was a plea to second degree murder?"  Mr. Hurley affirmed this as well.

[9] Nor, apparently, did he find a quid pro quo in Hunt's testimony and the Commonwealth's twin requests for an alternative place of incarceration and for concurrent sentences.

official promises to, or pressure on, Hunt which could be disclosed or used to impeach. The recommendation of leniency itself was not, he ruled, evidence that could impeach Hunt's credibility. Therefore, he held that it was neither exculpatory nor material, and the prosecutor had no duty to disclose the unaccepted offer.

The judge likewise ruled against the defendant on the allegation that the prosecutor had permitted the use of perjured testimony, viz., Hunt's claim that he testified without promises, threat, or pressure. He concluded that since there was no quid pro quo shown for Hunt's testimony, this statement was accurate.

Finally, the judge considered the closing remarks of the prosecutor at trial. He found that the prosecutor had given the jury the impression that there was nothing he or the Commonwealth could do for Hunt, when in fact he knew he would be likely to recommend a sentence for murder in the second degree in exchange for a plea. The judge ruled that, while the prosecutor was justified in relying on Hunt's failure to accept an offer which had been outstanding for eight months, the closing was nonetheless misleading. He concluded, however, that the misstatement was not so material as to warrant a new trial.

We disagree. In our view the failure of the prosecutor to disclose the outstanding offer presents a close question, but one that must nevertheless be resolved in the defendant's favor. When the failure to disclose is coupled with the blatant misrepresentation made by the prosecutor in his closing argument to the jury, the conclusion that the conviction cannot stand is inescapable.

Evidence tending to impeach the credibility of a key prosecution witness is clearly exculpatory. *Commonwealth* v. *Baldwin,* 385 Mass. 165, 175 (1982). *Commonwealth* v. *Ellison,* 376 Mass. 1, 22 (1978).[10] The existence of "any

---

[10] We cannot overemphasize Hunt's importance to the Commonwealth's case. Other witnesses provided corroboration of Hunt's testimony that he and the defendant were together after the crime, but Hunt

understanding or agreement between the government and a key government witness" is exculpatory evidence which must be revealed to the defendant, provided it is "material." *Commonwealth* v. *Gilday,* 382 Mass. 166, 175 (1980). *Giglio* v. *United States,* 405 U.S. 150, 154-155 (1972). *Napue* v. *Illinois,* 360 U.S. 264, 269 (1959). See *DeMarco* v. *United States,* 415 U.S. 449, 450 (1974); *Commonwealth* v. *Michel,* 367 Mass. 454, 460 (1975). See also *Zeigler* v. *Callahan,* 659 F.2d 254, 263 (1st Cir. 1981) (two-pronged test to determine whether failure to disclose terms of plea bargain requires reversal).

We have recognized three situations where a failure to disclose material, exculpatory evidence warrants a new trial. *Commonwealth* v. *Gilday, supra* at 177-178 & n.5, citing *United States* v. *Agurs,* 427 U.S. 97, 103-107 (1976). First, where, either through misfeasance or nonfeasance by the prosecutor, false testimony is introduced concerning an arrangement between the witness and the prosecutor, a strict standard of materiality is applied. A conviction will be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Gilday, supra* at 177, quoting from *Agurs, supra* at 103.

In addition, when a defendant has made a specific and relevant request for exculpatory evidence, the prosecutor's failure to respond to such a request will be excused only if "the error did not influence the jury, or had but very slight effect." *Gilday, supra* at 178, quoting from *Kotteakos* v. *United States,* 328 U.S. 750, 764 (1946).

Finally, if the defendant has not requested exculpatory information, or has made only a general *Brady* request, the failure to disclose will result in a new trial "if the omitted evidence creates a reasonable doubt that did not otherwise

provided the only evidence of the defendant's presence at the service station. Without Hunt's testimony, the Commonwealth could not have convicted the defendant. See *Commonwealth* v. *St. Germain,* 381 Mass. 256, 257 n.3 (1980). Cf. *Commonwealth* v. *Baldwin,* 385 Mass. 165, 174 (1982) (witness extremely valuable, though not indispensable).

exist." *Gilday, supra* at 178 n.5, quoting from *Agurs, supra* at 112. See *Brady* v. *Maryland,* 373 U.S. 83 (1963).

This case falls within the category of the second and third principles. The defendant's pretrial motion for exculpatory evidence was granted November 25, 1975. Thus, we conclude that the evidence of the arrangement with Hunt would tend to create a reasonable doubt as to the defendant's guilt which did not exist otherwise. We do not think it necessary, as the motion judge concluded, that such an "arrangement" be limited to situations where the favorable recommendation is explicitly hinged on receipt of favorable testimony. Cf. *Commonwealth* v. *Gilday, supra* at 176-177. The failure to disclose "must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Commonwealth* v. *Ellison, supra* at 23, quoting from *Agurs, supra* at 112-113. As the keystone of the Commonwealth's case, Hunt's testimony was particularly vulnerable to even slight blows to its credibility. The fact that Hunt had an offer of leniency, and, even more important, one that was in abeyance, was a circumstance which could lead the jury to the conclusion that the witness had reason to seek favor with the government by his testimony. We are aware of the effect that any inference of prosecutorial favoritism might have on a jury's estimation of a witness's credibility. See *Commonwealth* v. *Haywood,* 377 Mass. 755, 760 (1979), and cases cited. Such information was capable of creating a reasonable doubt which did not otherwise exist as to guilt.[11] See *Commonwealth* v. *Ellison, supra* at 23.

---

[11] The Commonwealth presented virtually no other evidence, apart from Hunt's testimony, that the defendant and he were together prior to July 10, the day *after* the crime. The Vermont State trooper testified that on July 12 the defendant had told him that he had picked Hunt up "hitchhiking down south." See note 4, *supra.* This is some evidence from which

Given the circumstances of this case, however, the omission need not be judged by the reasonable doubt standard. See *id.* at 23-24 & n.13. At a voir dire, Hunt was specifically asked from the bench whether anyone had made him any promises, and he stated that none had been made.[12] At that point, the prosecutor was bound to reveal to the court the existence of the outstanding offer of a plea to murder in the second degree. See *Commonwealth* v. *Baldwin, supra* at 173-174.

This is true even though this offer was made to Hunt at a time when the Commonwealth was unaware of the defendant's alleged participation in the crime. It was not a quid

---

the jury could infer that the two were together on July 9, but it is hardly sufficient to create an inference of complicity in the crime. Thus, there is no other evidence to support a conviction of the defendant for participation in the robbery, since a felony-murder conviction could also only flow from Hunt's testimony.

[12] The following colloquy took place:

THE JUDGE: "Do you understand that the consequences of involving yourself in a murder case are life imprisonment, Walpole State Prison?"

THE WITNESS: "Yes, I do."

THE JUDGE: "There are no other consequences that can flow from that involvement?"

THE WITNESS: "Yes, I do."

THE JUDGE: "You understand that if the armed robbery — if you involve yourself in an armed robbery which results in a death that you're guilty both of the murder and the armed robbery?"

THE WITNESS: "Yes, I do."

THE JUDGE: "And that the Judge has no discretion but to sentence you to life imprisonment either for first or second-degree murder?"

THE WITNESS: "Yes, I do."

THE JUDGE: "Has anyone promised you they won't bring the cases forward?"

THE WITNESS: "No, sir."

THE JUDGE: "Has anyone made any promises to you?"

THE WITNESS: "No."

Later the judge asked several other questions in the same vein.

THE JUDGE: "[Y]ou are aware that both your counsel are present."

THE WITNESS: "Yes."

THE JUDGE: "That neither have offered to have you plead guilty at this moment."

THE WITNESS: "Yes."

pro quo for Hunt's testimony at trial.[13]  Cf. *Commonwealth* v. *Michel, supra* at 461-462 (fact finder fully aware of details of negotiations in exchange for witness's testimony); *Commonwealth* v. *Bernard,* 6 Mass. App. Ct. 499, 508-509 (1978) (defendant was aware of the quid pro quo, cross-examined witness closely as to nature of agreement).  The fact that the questions to Hunt were typically phrased in terms of rewards in exchange for testimony saved his answers from constituting perjury.  At the same time, such phrasing had the effect of keeping the jury from a clearer perception of the possibility of Hunt's bias.  Compare *Commonwealth* v. *Stewart,* 375 Mass. 380, 388-389 (1978).  Thus, although the questions to Hunt might have been framed more specifically, and although the cases generally speak in terms of agreements in exchange for testimony, we are of the opinion that their thrust encompasses a request for evidence of *any* material arrangements between the Commonwealth and its key witness.  Contrast *United States* v. *DeLeo,* 422 F.2d 487, 498-499 (1st Cir.), cert. denied, 397 U.S. 1037 (1970) (even where information material, no prejudice results where defense counsel already has information sought).  The failure to disclose such an arrangement was improper.  See *Giglio* v. *United States, supra* at 155; *Commonwealth* v. *Gilday,* 382 Mass. 166, 175 (1980).

We consider whether, if the arrangement between Hunt and the Commonwealth had been disclosed to the jury, their verdict might have been different.  Applying this standard we conclude that the verdict and judgment must be set aside.  Having examined the transcripts, we find nothing to assure us that the jury would not have been swayed by knowledge of the agreement.  This was not a case where the evidence of the defendant's guilt was so overwhelming that the consequences of the failure to disclose were only minimal.  See note 11, *supra.*  Compare *Com-*

---

[13] We note, though, that this is a distinction which might easily be lost on a jury.  See *United States* v. *Bynum,* 567 F.2d 1167, 1169 (1st Cir. 1978).

monwealth v. *Ellison, supra* at 25, with *Commonwealth* v. *Gilday, supra* at 178-179. The matter was not explored by defense counsel in a manner sufficient to create a "satisfactory substitute for the material withheld." *Commonwealth* v. *Ellison, supra.* It is true that the jury heard Hunt express a hope that he would receive lighter treatment as a result of his testimony. In different circumstances, we might conclude that the jury's knowledge of the offer of a plea to murder in the second degree would not do damage to the credibility of a witness who had so testified. Compare *United States* v. *Bynum,* 567 F.2d 1167, 1170 (1st Cir. 1978). Cf. *Mastrian* v. *McManus,* 554 F.2d 813, 823 (8th Cir.), cert. denied sub nom. *Mastrian* v. *Wood,* 433 U.S. 913 (1977) (mere general expectation of leniency need not be revealed to jury absent express or implied promise). Here, however, Hunt insisted that he had no reason to expect leniency. Furthermore, within seconds of expressing the hope for leniency, he denied having such hopes. This, when viewed together with the several different accounts of the crime Hunt had given, gave extra weight to the existence of the offer as a factor to be weighed in assessing Hunt's credibility.

Though a plea to murder in the second degree would not offer a chance of parole for fifteen years, it is not difficult to weigh its appeal to the witness as compared to a life sentence without hope of parole. See *Commonwealth* v. *Ellison, supra* at 20. The jury would be sure to make a similar estimate in comparing Hunt's different accounts of the crime. We have no doubt that the believability of Hunt's testimony, vis-à-vis his earlier confessions, was greatly enhanced for the jury by the fact that it appeared to be given under the shadow of a term of life imprisonment. Likewise, we have no doubt that the prosecutor was well aware of this.

*Prosecutorial error.* Even were we to conclude that the failure to disclose the arrangement with Hunt was not grounds for reversal, we have an independent ground for reversal based on that portion of the prosecutor's closing re-

marks which touched on Hunt's future prospects (see *supra* at 5). The judge who denied the defendant's motion for a new trial ruled that "the closing was misleading to the extent that the prosecutor indicated there was nothing he or the Commonwealth could do for Mr. Hunt where, in fact, he was authorized to recommend a plea to second degree murder." The judge, however, viewed the misstatement "in light of the totality of the prosecutor's closing argument" and concluded it was not material enough to warrant a new trial. We have viewed the misstatement with regard to the "entire circumstances in the case" to reach the opposite conclusion. *Commonwealth* v. *Roberts*, 378 Mass. 116, 118 (1979).

As we have said earlier, the prosecutor must have been able to assess the impact on the jury of knowledge of Hunt's chances after the defendant's trial. His closing remarks give the appearance of careful construction intended to impart a very definite meaning. Compare *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 646-647 (1974). The image of Hunt he chose to present to them was not that of a man who had made some arrangements with the authorities to ensure a lesser punishment. Rather, he presented a man who, solely out of principle, had chosen to testify to a series of events which would land him in prison for the rest of his life. In this light, Hunt's testimony could be cloaked in an aura of credibility in the past attributed to dying declarations. In this context we repeat the language of the United States Supreme Court: "As long ago as *Mooney* v. *Holohan*, 294 U.S. 103, 112 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio* v. *United States*, 405 U.S. 150, 153 (1972).

Where such a choice to mislead the jury appears to have been deliberate, and given the extreme significance of Hunt's credibility to the Commonwealth's case, we think that this attempt by the prosecutor to bolster it artificially

warrants a new trial.[14]   Compare *Commonwealth* v.
*Hooks,* 375 Mass. 284, 297 (1978).

*Judgments reversed.*

*Verdicts set aside.*

HENNESSEY, C.J. (dissenting).  I dissent.  I agree with the
majority that the prosecutor's conduct here must be exam-
ined in light of principles which require the disclosure of
material, exculpatory evidence, as well as the principle
which requires the prosecutor to speak remedially when he
knows that a witness is giving false and misleading testi-
mony as to plea bargaining.  Nor should the prosecutor, in
argument or otherwise, himself knowingly deceive or mis-
lead the jury.  Nevertheless, I think the trial judge was cor-
rect in concluding that nothing occurred here to warrant a
new trial.

At the time of the trial the prosecutor's offer to Hunt to
recommend a sentence for murder in the second degree had
been outstanding and unaccepted by Hunt for more than
eight months.  More importantly, that offer was made to
Hunt *before* the prosecutor knew of a second person's in-
volvement.  While it may not always be controlling in cases
like this that the prosecutor's offer was not in the nature of a
quid pro quo, that fact is certainly highly significant.  In
this case Hunt was, first and last, offered a second degree
recommendation, and it was not a quid pro quo offer.  If
the jury had known all the circumstances, it is not logical to
assume that they would have been significantly influenced
in their appraisal of Hunt's credibility.  I have in mind here
that the defendant of course had the aid of the jury's com-
mon sense and their knowledge from Hunt's testimony that
he hoped to improve his own situation by his testimony in-

---

[14] We note such an impression would be magnified in impact coming as
it did in the closing.  Compare *Commonwealth* v. *Martinez,* 384 Mass.
377, 381 (1981).

culpating the defendant. The aggressive argument of defense counsel on this issue would not have been stronger or more convincing if all the plea bargaining facts, *up to the time of the closing arguments,* had been disclosed to the jury.[1]

It would have been wiser for the prosecutor to have omitted the controversial comment in his closing argument, but our inquiry here should focus on the cause and effect relationship between the prosecutor's conduct and the conviction of the defendant. Doing that, I conclude, with the trial judge, that what occurred here was "not so material as to warrant a new trial."

---

[1] Defense counsel argued to the jury as follows: "[Hunt] is lying because he wants a short sentence. He is lying because he hopes he will get something out of it. He told you from the witness stand, I hope I will get something out of this. That is why he is testifying here today; that is why he testified the day before yesterday, I beg your pardon, and that is why and for no other reason. Because if he had a conscience, he would have turned Vincent Collins in the very first chance he got and he did not do it."