**Arnold J. ELY, Petitioner,**

v.

**James MATESANZ, Respondent.**

**No. CIV. A. 95–10323–RCL.**

United States District Court,
D. Massachusetts.

Oct. 29, 1997.

Gary C. Crossen, Lisa Hay, Foley, Hoag & Eliot, Boston, MA, for Petitioner.

Arnold J. Ely, Norfolk, MA, pro se.

Gregory I. Massing, Gail M. McKenna, Atty. Gen.'s Office, Boston, MA, Robert N. Sikellis, Office of Atty. Gen., Crim. Bureau, Boston, MA, for Respondent.

## ORDER ON REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

LINDSAY, District Judge.

Before the court are the petition of Arnold Ely, pursuant to 28 U.S.C. § 2254, for the issuance of a writ of habeas corpus and a motion of the respondent, James Matesanz in opposition to and to dismiss the petition. These matters were referred to Magistrate Judge Zachary R. Karol for an evidentiary hearing and for a report and recommendation to this court as to the disposition of the petition.

In September 1980, Ely was convicted in a Massachusetts state court of murder in the first degree, assault with intent to commit murder, and arson. In his petition to this court, he has articulated four grounds in support of his petition: (1) the prosecutor in his criminal trial suppressed exculpatory evidence (specifically, a plea agreement between the Commonwealth and the primary witness, co-defendant, David Gosselin); (2) the prosecutor failed to correct false testimony of Gosselin that Gosselin (who named Ely as the architect and artisan of the crimes) was not testifying pursuant to the plea agreement; (3) the prosecutor used Gosselin's false testimony to the advantage of the Commonwealth in his closing argument; and (4) the prosecutor's failure to disclose the plea agreement effectively denied Ely his Sixth Amendment right to confront and cross-examine witnesses against him.

Judge Karol recommended that the respondent's motion to dismiss be denied, and that the writ issue, unless the Commonwealth grants a new trial to Ely within ninety days of the acceptance by this court of the magistrate judge's report and recommendation. I agree with Judge Karol's well-reasoned analysis of the issues raised by the petition and accordingly accept his report and recommendation. Therefore, the writ shall issue unless the Commonwealth grants Ely a new trial within ninety days of this order.

SO ORDERED.

## (1) REPORT AND RECOMMENDATION REGARDING RESPONDENT'S MOTION TO DISMISS AND OPPOSITION TO PETITION (DOCKET NO. 39) AND (2) PROPOSED FINDINGS OF FACT AND RECOMMENDATION FOR DISPOSITION PURSUANT TO RULE 8(b)(1)

KAROL, United States Magistrate Judge.

### I. OVERVIEW

In September 1980, petitioner, Arnold Ely ("Ely"), was convicted by a jury in Essex County, Massachusetts of first degree murder and related offenses. Since then, he has been serving a mandatory life sentence without the possibility of parole. His primary defense at trial was that the crime had been committed by his former co-defendant (and

the only other eyewitness), David Gosselin ("Gosselin"). Ely's conviction was affirmed by the Massachusetts Supreme Judicial Court ("SJC") in January 1983. *See Commonwealth v. Ely*, 388 Mass. 69, 444 N.E.2d 1276 (1983).

In October 1984, Ely filed the first of several state court motions seeking collateral review of his conviction. His primary arguments were that: (1) newly discovered information strongly suggested that the prosecutor and Gosselin had entered into an undisclosed plea agreement pursuant to which Gosselin had agreed to testify against Ely in exchange for a lenient juvenile sentence, and (2) assuming that a plea agreement existed, the prosecutor violated his Constitutional obligation by: (a) failing to speak up and correct the record when Gosselin, upon being cross-examined under oath at trial, falsely denied that such agreement existed, and (b) arguing to the jury, based on Gosselin's perjured testimony, that Gosselin had no reason to lie about Ely's commission of the crime. The Superior Court denied the motion without a hearing (and, apparently, before any opposition had been filed) on the ground that Ely lacked sufficient evidence to support his belief that a plea agreement in fact existed. Ely sought reconsideration. This time the Commonwealth filed an opposition, arguing primarily that no such agreement existed and going so far as to suggest that Ely's belief to the contrary was delusional. In June 1986, the Superior Court denied the motion for reconsideration on the ground that Ely did not have sufficient admissible evidence of an agreement to warrant holding an evidentiary hearing on the matter.

In 1990, Ely filed another motion for reconsideration on the basis of additional newly discovered evidence. The Superior Court treated the motion as one for leave to appeal the 1986 denial of the motion for new trial and, in accordance with state law, referred the matter to a Single Justice of the SJC for consideration. Again, the Commonwealth opposed, on the ground, *inter alia*, that there was insufficient proof of any agreement. In June 1993, following a non-evidentiary hearing at which the Single Justice expressed doubt about the sufficiency of Ely's hearsay and circumstantial evidence that an agreement existed, the Single Justice denied Ely's motion for leave to appeal.

In May 1994, Ely's case took a dramatic turn. Ely succeeded in obtaining a copy of a hand-written plea agreement dated October 31, 1979, between Gosselin's former counsel and the prosecutor. No doubt feeling vindicated, Ely filed another motion for new trial in Superior Court, to which he attached a copy of the newly discovered plea agreement. Despite this startling and compelling new evidence, the Commonwealth again successfully opposed on the fallacious ground that Ely was simply rehashing arguments heard and rejected numerous times before. In August 1994, a Single Justice of the SJC, without comment, denied Ely's motion for leave to appeal the Superior Court's denial of Ely's latest motion for new trial.

In February 1995, Ely filed the present petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He again claimed that the prosecutor had suppressed a plea agreement with Gosselin and had relied upon, rather than exposed, Gosselin's perjury. In its response, the Commonwealth, having virtually ridiculed in state court filings for more than a decade Ely's unconfirmed suspicion that an agreement existed, conceded for the first time that Ely had been right all along. Not only did it concede the existence of the plea agreement, but it made the astonishing claim that the prosecutor had in fact disclosed, and all parties had always known about, it. (Def.'s Mem. Law Supp. Mot. Dismiss and in Opp. to Pet. at 17, Docket no. 44.) It moved to dismiss the petition on this basis and on the equally bizarre ground that Ely procedurally defaulted because he made a deliberate "strategic decision": (1) not to object at trial to Gosselin's perjured testimony, (2) not to use the plea agreement at trial to impeach Gosselin, and (3) not to raise on direct appeal the prosecutor's suppression of exculpatory evidence and breach of duty to disclose Gosselin's perjury. (*Id.* at 31.)[1] It also

---

1. To be consistent with the logic of its argument, the Commonwealth must also contend that, although Ely had proof of the agreement's existence as early as 1979, he made a "strategic

makes a strained argument that Gosselin "was not the Commonwealth's 'key witness'," (*id.* at 41); that the plea agreement was not material; that Ely, for all his effort, failed to exhaust state law remedies; and that the prosecutor had no duty to expose Gosselin's perjury because: (1) if there was any perjury, the defense was equally aware of it, and (2) while Gosselin's testimony was literally false, it was not, under the prosecutor's subjective interpretation of it, substantively false.

As set forth in greater detail below, I conclude on the basis of the evidence presented at a lengthy evidentiary hearing that the plea agreement (the existence of which is no longer disputed) was in fact suppressed; that the prosecutor violated his constitutional obligation to expose and not rely upon Gosselin's perjury (or at least false testimony); that the suppression of the agreement and Gosselin's false denial of its existence were material and not harmless; and that there was no procedural default or failure by Ely to exhaust state remedies. I therefore recommend that the Commonwealth's motion to dismiss be **DENIED** and that Ely's petition be **GRANTED**.

## II. *BACKGROUND AND PRIOR PROCEEDINGS* [2]

In the summer of 1977, Ely, age 16, and Gosselin, age 15 were foster children living in the Newburyport home of Albert Schrempf. Schrempf's two natural children, Alan, age 17, and David, age 13, also lived in the house. On September 14, 1977, a flash fire at the Schrempf home killed Alan and left David in a coma from which he has not recovered. A neighbor testified at trial that, two weeks prior to the fire, she heard Ely, in Gosselin's presence, arguing with David Schrempf and threatening to kill him and his brother Alan by locking them in their rooms and burning the house down.

Twelve days after the fire, Gosselin's friend, Robert Tremblay ("Tremblay"), gave a written statement to the police. (Statement of Tremblay, E.H. Ex. 16.) [3] Tremblay said that on the day following the fire Gosselin had told him that Gosselin and Ely had spread gasoline in the house and on the porch and that Gosselin had actually lit the match that ignited the gasoline, after Ely had unsuccessfully attempted to do so. Gosselin's motive, according to Tremblay's account of Gosselin's confession, was that Gosselin believed David Schrempf had stolen $90.00 from him. Gosselin also allegedly told Tremblay that he had only intended to scare David Schrempf, not to harm him.

No one was charged with the crime until September 1979, apparently because it was not until then that the police gave up any hope that they would be able to interview the still-unconscious David Schrempf. On September 15, 1979, the police arrested Gosselin and charged him with delinquency by reason of murder and arson. On that same day, Gosselin gave a written statement to the police in the presence of Assistant District Attorney Patrick Riley ("Riley"), who would later prosecute the case against Ely. Gosselin would admit only that he was present when the fire started. He claimed that Ely and only Ely had spread the gasoline and lit the match. The next day, again in the presence of the police and Riley, Gosselin gave an expanded statement in which he again accused Ely of spreading the gasoline and lighting the fire. Even after he was confronted with Tremblay's statement, Gosselin specifically denied that he had lit any matches himself, that he had told Tremblay that he had done so, or even that he had spoken at all to Tremblay about the fire. He also said he could not recall any incident prior to the fire at which Ely had threatened, in Gosselin's presence, to burn down the Schrempf home with Alan and David

decision" to wait in prison for fourteen years before showing his hand, because he wanted to enhance the credibility of his claim that the agreement had been suppressed.

2. Unless otherwise noted, facts stated in this section are undisputed. These facts shall be deemed part of my proposed findings pursuant to Rule 8(b)(1) of the Rules Governing Section 2254

Cases in the United States District Courts (the "Rules"). Proposed findings regarding disputed facts are set forth in Section III.

3. Exhibits admitted at the evidentiary hearing on the Commonwealth's motion to dismiss are designated "E.H. Ex."

Schrempf locked inside. On the strength of Gosselin's statement, Ely was arrested on September 20, 1979, and, like Gosselin, charged with delinquency by reason of murder and arson.

Separate state court hearings, sometimes referred to as transfer hearings, were scheduled for Gosselin and Ely to determine if probable cause existed and whether their cases should be transferred from Juvenile to Superior Court. Gosselin's hearing commenced first, on October 3, 1979. (Gosselin Transfer Hearing Tr. of 10/3/79, E.H. Ex. 8.) Pursuant to state law, these transfer hearings were closed to outsiders, with the result that Ely and his counsel were excluded from Gosselin's hearing. The first day of Gosselin's hearing concerned the issue of probable cause. Riley stated on the record, in the presence of Gosselin and Gosselin's counsel, that he had personally interviewed Tremblay in Maine and that Tremblay had expressed a willingness to testify against Gosselin. (*Id.* at 20–21.) He also elicited testimony from a police investigator to the effect that Tremblay had provided evidence that Gosselin, despite his denials, "was involved in the actual lighting of that fire on the 14th day of September, 1977." (*Id.* at 40.) At the conclusion of the first day of the hearing, the court found probable cause. (*Id.* at 48.)

The second day of Gosselin's transfer hearing, to determine if Gosselin should be tried as an adult in Superior Court for murder and arson, was scheduled to begin on October 26, 1979. Between the end of the first day's hearing at which probable cause had been found and the beginning of the second day's hearing, Riley and Gosselin's counsel, Albert S. Previte ("Previte"), engaged in plea negotiations. The substance of their discussion was that Riley would agree to recommend juvenile treatment for Gosselin if: (1) Gosselin cooperated in the prosecution of the case against Ely; and (2) a suitable treatment program for Gosselin could be arranged through the Department of Youth Services ("DYS"). In furtherance of this objective, Previte and Riley met with DYS representatives on October 17, 1979, to discuss possible treatment options. (Letter from DYS to Riley of 11/26/79, at 1, E.H. Ex. 6; Gosselin

Transfer Hearing Tr. of 10/26/79, at 33–35, E.H. Ex. 7.) There was no resolution at the time of their meeting with DYS, but the DYS representatives agreed to continue to explore options in the hope that they would be able to devise a program satisfactory to Riley.

This is where matters stood when Gosselin's transfer hearing resumed in state District Court on October 26, 1979, again outside of the presence of Ely and Ely's counsel. At the hearing, Riley, Previte, and DYS, in Gosselin's presence, alerted the judge to the likelihood that there would be a plea agreement, but they also called to his attention a potential snag. The snag was that Gosselin was approximately one month from turning 18 and, once he turned 18, DYS could no longer retain him in custody pursuant to a District Court order. (Gosselin Transfer Hearing Tr. of 10/26/79, at 28–29; 31–32.) If, however, Gosselin's case were transferred to Superior Court, the Superior Court would have authority under state law to order that Gosselin be retained in DYS custody until he turned 21, provided that Gosselin pleaded guilty in Superior Court and were sentenced before he turned 18. This presented Previte and Gosselin with a dilemma. If they continued to resist transfer to Superior Court, they faced the risk that, by the time DYS had formulated a treatment program satisfactory to Riley, Gosselin would have turned 18 and it would be too late for the Superior Court to implement a plea agreement whereby Gosselin would remain in DYS custody until the age of 21. On the other hand, if they agreed to waive their opposition to transfer of the case to Superior Court, they faced the risk that DYS would not be able to formulate a program satisfactory to Riley in the limited time available and there would be no plea agreement, leaving Gosselin to face trial as an adult in Superior Court for murder and arson.

In Gosselin's presence, Previte acknowledged his dilemma to the District Court judge and agreed to waive transfer to Superior Court. (*Id.* at 35–36.) He did so expressly based upon his "tentative agreement with the district attorney's office" and "on assurance from the district attorney's office and from the [DYS] staffing counsel and

knowing Mr. Riley and his office will keep their word they gave me." (*Id.*) Riley responded by stating that he wanted to make it "quite clear" that "we are not saying that we agree to treat [Gosselin] as a juvenile in the Superior Court and send him to DYS without some definitive plan of program." (*Id.* at 37.) Despite such reservation about the prospects of *juvenile* treatment, however, Riley went on to say that, with respect to the prospects of lenient treatment generally, he had:

> assured Mr. Previte ... and DYS that the Commonwealth will make every reasonable effort to look at that proposed treatment plan in depth, and *I have assured that Mr. Previte*, because of the plea negotiations and, *primarily, based on the cooperation of the defendant and the expected cooperation of the defendant, that something can and will be worked out in the Superior Court.*

(*Id.* at 38) (emphasis added). Riley went on to state, with respect to the extreme time pressure everyone was facing:

> I can tell the Court without any hesitation that we have been [sic] one month to accomplish all the things that the defense wants to accomplish, and as I stated before, *if things are as they appear to be, vis-a-vis the cooperativeness of this defendant, the Commonwealth will have this case indicted and disposed of before the 18th birthday.*

(*Id.* at 48–49) (emphasis added). Mr. Previte then responded, *"I think we have reached a tentative agreement."* (*Id.*) (emphasis added). Discussion then turned to the logistics of obtaining an indictment in time to dispose of the case in Superior Court before Gosselin's 18th birthday. (*Id.* at 49–50.) All of this colloquy transpired *in Gosselin's presence* at a hearing from which Ely and his counsel were excluded. None of it was disclosed to Ely or his counsel until the evidentiary hearing was underway in this court,

some sixteen years later, on the Commonwealth's motion to dismiss Ely's habeas petition.

Ely's transfer hearing, which had commenced before a different District Court judge on October 24, 1979, resumed on October 31, 1979, or five days after the foregoing colloquy had taken place at Gosselin's transfer hearing. Gosselin testified as the principal witness against Ely. He was asked the following question by Riley: "Have any promises been made by myself or the Newburyport Police Department or anyone from D.Y.S. or anything; have any promises been made to you about your testimony?" to which Gosselin responded "No." (2 Ely Transfer Hearing Tr. at 44.)[4] Ely's court-appointed attorney, Richard G. Shalhoub ("Shalhoub"), then asked Gosselin the following question: "Did Mr. Previte tell you that he had a deal worked out with the District Attorney if you testified?" to which Gosselin responded "No." (*Id.* at 44–45.)[5] Gosselin further responded "No," when Shalhoub asked: "By your testifying here today do you expect that Mr. Riley here is going to help you out on disposition of this case in some way?" (*id.* at 135), and Gosselin went on to deny knowing "that Mr. Riley can recommend that you be treated as a juvenile," (*id.* at 137). In response to the question "what do you think is going to happen to you as a result of your testifying here today?" Gosselin testified, "I don't know." (*Id.* at 141.) Also, when Shalhoub asked if he knew whether his lawyer and Riley "had worked out a deal," or whether anyone had told him "that they had worked out a deal," Gosselin's response was "No." (*Id.* at 174–75.)

At no time during Ely's transfer hearing on October 31 did Riley disclose that, five days earlier, he had "assured" Previte, in Gosselin's presence, "primarily based on the cooperation of the defendant and the expected cooperation of the defendant, that something can and will be worked out in the

---

**4.** Ely's transfer hearing took place on October 24, October 31, and November 20, 1979. The transcript of these proceedings is contained in three volumes, each corresponding to a different day. Citations to this transcript will refer to the transcript volume, rather than the corresponding date.

**5.** Pages 45–47 to volume 2 of Ely's Transfer Hearing Tr. are located in Materials Filed Pursuant to Order Dated January 11, 1996 to Expand Record, Docket no. 47.

Superior Court." (Gosselin Transfer Hearing Tr. of 10/26/79, at 38.) Nor did Riley disclose that. five days earlier, in Gosselin's presence, he had told the District Court judge that "if things are as they appear to be, vis-a-vis the cooperativeness of this defendant, the Commonwealth will have this case indicted and disposed of before the 18th birthday," to which Mr. Previte had responded, in Gosselin's presence, "I think we have reached a tentative agreement." (*Id.* at 48–49.)

Immediately following Gosselin's testimony against Ely, apparently while Previte and Riley were still at the courthouse and before there had been any further word from DYS regarding the availability of suitable treatment programs for Gosselin, Riley wrote out a plea agreement in longhand. (Gosselin Plea Agreement, E.H. Ex. 1A.) The plea agreement, which is signed by Riley and Previte and dated October 31, 1979, states in its entirety:

It is agreed that the Essex Co. D.A.'s office will recommend the following disposition for the defendant, David Gosselin in exchange for a plea of guilty to Manslaughter and Arson.

1. that he be committed to the DYS up until the age of 21 years old, if and only if the following conditions are met.

(a) that DYS formulate and devise a program of treatment for the defendant satisfactory to the Essex County D.A.'s office with specific concern to the security factor in said program and the protection of the public

(b) that prior to the aforementioned recommendation, DYS shall have examinations and evaluations of the defendant completed by competent professionals and the results of said examinations support the type of programs mentioned in paragraph (A)

(c) that the defendant D.G. testify in the case of Com. vs. Arnold Ely fully and truthfully in all proceedings, as needed

(d) 3 yrs Straight Probation from & after on Arson Charge

(2.) In the event that (1A & B) is not acceptable due to the conditions re: DYS program & evaluation are not satisfactory to E.C.D.A.'s office then the recommendation would be M.C.I.C. [Massachusetts Correctional Institution at Concord] 20 yrs on Manslaughter & Arson.

s/ Albert S. Previte
Atty for David Gosselin

s/ Patrick J. Riley
Asst' D.A.

(Gosselin Plea Agreement.)

Because of the provisions of paragraph (2.), Gosselin was assured that, even if DYS did not timely propose a program acceptable to Riley, Riley would still recommend that Gosselin receive only a relatively lenient 20 year sentence at MCI Concord in exchange for his "full[ ] and truthful[ ]" testimony against Ely.[6] Thus, true to the assurances that Riley had given five days earlier at Gosselin's own transfer hearing, and before Riley had any additional reason to believe that a satisfactory DYS program would be available, Riley and Previte were able to "work something out" in reliance on Gosselin's "expected cooperation," but not until Gosselin had testified under oath against Ely and locked himself into a version of the facts that was satisfactory to Riley. Under these circumstances, Gosselin would know that, if his "full and truthful" testimony at trial deviated in any material respect from the testimony he had just given at the transfer hearing, he risked, at a minimum, being prosecuted for perjury, because his testimony at either the transfer hearing or at the trial would necessarily have been false.

The third day of Ely's transfer hearing took place on November 20, 1979. Shalhoub did not recall Gosselin to testify, although he

---

**6.** Testimony at the evidentiary hearing established that, in 1979, a defendant who received a 20 year "Concord sentence" might not have to serve more than 2 to 2.5 years before being released on parole. (2 Evidentiary Hearing Tr. at 108–9.) The evidentiary hearing took place on five days in 1996: April 24, April 29, May 2, May 8, and July 1. The transcript of the hearing is contained in five volumes, each corresponding to a different day. Citations to the evidentiary hearing will refer to the transcript volume, rather than the corresponding date.

had reserved the right to do so. Toward the conclusion of the hearing, the District Court judge found probable cause with respect to murder, assault with intent to commit murder, and burning of a dwelling house. (3 Ely Transfer Hearing Tr. at 18–19.)

On November 29, 1979, a Superior Court judge accepted Gosselin's plea of guilty to reduced charges of manslaughter and arson. At the plea colloquy, the judge, after hearing the sentence Riley was recommending and advising Gosselin of his rights, made the following statement:

> We have you in our clutches for the next five or six years. If you mess up at all during that time the system will put you away for so long that you'll be an old man by the time you get out—if you ever get out. Do you understand that?

(Gosselin Plea Tr. at 26.) [7] Gosselin responded "Yes," and reconfirmed his desire to plead guilty and his assertion that no one was putting any pressure on him to do so, at which point the court accepted his plea. (*Id.* at 26–27.) At no time during the course of the plea colloquy was it disclosed to the Superior Court judge (on the record, at least) that there was a plea agreement between the Commonwealth and Gosselin pursuant to which Gosselin was required to testify against Ely in exchange for the Commonwealth's recommendation of leniency.

In early 1980, Ely was indicted and his case was transferred to Superior Court, where he was to be tried as an adult. Ely retained private counsel, Paul F. O'Neill ("O'Neill"), to whom Shalhoub transferred the case file. (5 Evidentiary Hearing Tr. at 55–56.) The case was called for pre-trial conference on February 8, 1980. Riley and O'Neill signed a Pretrial Conference Report whereby Riley agreed to provide to O'Neill, on or before February 22, 1980, "any facts of any exculpatory nature within the possession, custody or control of the prosecutor." (Pretrial Conf. Rept. at 1, Riley Aff. ¶ 9, E.H. Ex.

5.) It is undisputed that the Gosselin plea agreement was "exculpatory" both within the meaning of this agreement and, assuming materiality, as that term is used in the relevant case law. It is also undisputed that there is no written record confirming that Riley ever provided or disclosed the written plea agreement to O'Neill, to Shalhoub, or to Ely.

Ely's trial commenced September 2, 1980. The Schrempf's neighbor testified that, two weeks before the fire, she had heard Ely, in Gosselin's presence, threaten David Schrempf that he, Ely, would burn down Schrempf's house with David and his brother Alan locked inside.[8] (1 Ely Trial Tr. at 68–69.) She also testified that, approximately five minutes before she heard someone shout "Fire," she saw Gosselin and Ely "jogging down the street" toward town. (3 Ely Trial Tr. at 312.) Aside from this testimony, there was no evidence linking Ely to the fire except Gosselin's testimony. On the stand, Gosselin, among other things, refuted the neighbor's testimony that he had been present during an argument between Ely and David Schrempf two weeks (or at any other time) before the fire, (2 Ely Trial Tr. at 228–29), and claimed to have no recollection of any conversation with Tremblay about the fire, (*id.* at 233–34; 244–245).[9] Gosselin further testified that Ely and Ely alone had spread the gasoline and ignited the fire, and that Ely had done so to retaliate against David Schrempf because Schrempf had stolen a letter to Ely from Ely's girlfriend and had read the letter to Gosselin and others. (*Id.* at 211–215.)

Riley elicited from Gosselin the fact that he had pleaded guilty to manslaughter and arson and that he had been sentenced to detention at a juvenile facility. (*Id.* at 204–05.) He did not, however, elicit or otherwise disclose to the court or jury the fact that Gosselin had entered into a formal written plea agreement with the Commonwealth;

---

7. The transcript from Gosselin's change of plea hearing are included at pages 151–179 of petitioner's Record Appendix ("Record Appendix") (Docket no. 9).

8. The transcript of Ely's trial, *Commonwealth v. Ely,* is contained in four volumes. Citations to

the transcript will include reference to the volume as well as the page number where the cited material is located.

9. Tremblay did not testify, since neither party could locate him at the time of trial.

that Gosselin had agreed, as a condition of receiving a lenient sentence, to testify in the case against Ely; or that, shortly before Gosselin was to testify at Ely's transfer hearing, Riley had given his personal assurances in a closed court proceeding, in Gosselin's presence, that a deal favorable to Gosselin could and would be worked out, assuming Gosselin provided the cooperation expected of him.

On cross examination, after eliciting the fact that Gosselin had pleaded guilty to manslaughter and arson, O'Neill attempted through various means to get Gosselin to admit that he had entered into and was testifying pursuant to a plea agreement under which he would receive a lenient juvenile sentence if he testified against Ely. First, O'Neill asked Gosselin if the Superior Court was treating him as an adult or as a juvenile. Gosselin testified, no doubt to O'Neill's surprise, that he was being treated as an adult. (3 Ely Trial Tr. at 298–99.) O'Neill then asked: "Did you agree that if you pleaded guilty that you would go to the Department of Youth Services?" to which Gosselin falsely responded "No." (*Id.* at 299.) O'Neill tried again; he asked, "Did you make these pleas of guilty on the stipulation that you would testify against Arnold Ely?" to which Gosselin first answered "No" and then immediately added, "I don't understand." (*Id.* at 300.) O'Neill attempted to clarify by asking: "Did you as part of the agreement, did you plead guilty with the understanding that you would testify against Arnold Ely?" (*Id.*) Gosselin responded, falsely, "No agreement was made." (*Id.*) Then, after Gosselin testified that he had in fact told the authorities he was willing to testify against Ely, O'Neill asked, "I'm asking you now again, was that [i.e. Gosselin's willingness to testify against Ely] part of the agreement?" and Gosselin falsely replied "No." (*Id.*) O'Neill tried yet again to get Gosselin to admit that there was a plea agreement that included, as one of its conditions, that Gosselin testify against Ely. He asked, "It was not part of the agreement?" to which Gosselin again responded "No." (*Id.*) Still unsatisfied with Gosselin's responses, O'Neill tried yet another approach. He asked: "David, do you know why you were at the Department of Youth Services if you

were being treated as an adult?" (*Id.* at 300–01.) Riley objected and the court, having no doubt heard enough of this line of questioning, sustained the objection, stating twice, "Let's get off that." (*Id.* at 301.) O'Neill did not confront or otherwise attempt to impeach Gosselin with the actual plea agreement, a copy of which the Commonwealth now contends was in his possession throughout this interrogation.

Riley, despite having signed a plea agreement with Gosselin less than a year before, never spoke up to advise the court, the jury, or defense counsel that Gosselin's testimony was false. Then, in his closing, Riley argued to the jury:

> David Gosselin's case, ladies and gentlemen, is over. Davey Gosselin has pled guilty. The trial that we're here for is Arnold Ely's trial. The evidence that was presented to you by the Commonwealth through me is the evidence of guilt against Arnold Ely, not against David Gosselin. Davey Gosselin played a role in that evidence, inasmuch as David Gosselin was a participant in that crime and an admitted participant. He told you what he observed Arnold Ely doing that night. If you take what counsel has suggested, that he has no axe to grind [i.e., with respect to his repudiation of the neighbor's testimony that he was present when Ely threatened David Schrempf], if you take that as true, then *why would he come in here after his case is over, after he's been sentenced, why would he come in here and tell you that Arnold Ely did what he told you he did? What has he got to gain by telling you anything but the truth?*

(4 Ely Trial Tr. at 527–28) (emphasis added).

The only other witness on the issue of who started the fire was Ely himself. Ely testified, in substance, that, on the evening of the fire, Gosselin and David Schrempf had been fighting about money; that he, Ely, had gone to the bathroom and, when he came out, he saw Gosselin spreading gasoline around the kitchen and porch; that he went outside just as Gosselin lit a match that ignited a fire that immediately engulfed the porch in flames; that he and Gosselin then ran away because

they were scared; that, when they stopped running, Ely asked Gosselin why he did it, and Gosselin replied that "David owed him money and he didn't pay him, and he was mad at him, and he lit the house on fire." (*Id.* at 406–11.)

The jury, faced with the issue of whether to believe the squarely conflicting testimony of Gosselin or Ely, chose to believe Gosselin and convicted Ely on all charges.[10] He was sentenced to a mandatory term of life imprisonment on the conviction for first degree murder and to a term of imprisonment for years on the other charges. His conviction was affirmed by the SJC on direct appeal. *See Commonwealth v. Ely,* 388 Mass. 69, 444 N.E.2d 1276 (1983). The appeal did not concern the question whether there had been a plea agreement or whether Gosselin had lied when he denied there was.

Ely filed a *pro se* motion in Superior Court for new trial pursuant to Mass. R. Cr. P. 30 in October 1984. (Mot. New Trial, Record Appendix at 21.) In it he presented all the claims he makes here with respect to the suppression of the plea agreement and Riley's failure to disclose and reliance upon Gosselin's false testimony. Ely could not and did not cite any new evidence to support his belief that a plea agreement existed and had been suppressed, but he did file a memorandum in which he argued that, given the timing of Gosselin's plea, "one would be hard-pressed to find that there was no promise and or an agreement made between David Gosselin and the prosecutor." (Def.'s Mem. Law Supp. Mot. New Trial at 7, Record Appendix at 23.) He also filed an affidavit in which he stated "that the outstanding evidence that he needs to substantiate his claims in [sic] unattainable [sic] to him without an order by this court." (Def.'s Aff. Supp. Mot. New Trial ¶ 8, Record Appendix at 24.) On December 13, 1984, before any opposition had been filed, the court denied

Ely's motion, "without prejudice," on the ground that "the averments therein are merely conclusional in nature and do not set forth a single factual averment of any substance or consequence." (Appendix B to Commonwealth's Mem. Opp. Def.'s Mot. for Evid. Hearing and Mot. for Reconsideration of Mot. for New Trial, Supplemental Record Appendix, Tab C, Docket no. 88.)

On January 9, 1985, Ely, in compliance with state law, sought leave from a Single Justice of the SJC to appeal the denial of his motion for new trial. (SJC Docket in *Commonwealth v. Ely,* Case no. 85–10, Entry no. 1, Docket no. 38.) He also filed a motion for appointment of counsel, which motion was allowed on January 10, 1985. (*Id.,* Entry nos. 3 and 4.) On October 7, 1985, court-appointed counsel, J. Russell Hodgdon ("Hodgdon"), filed a motion and memorandum in Superior Court for reconsideration of that court's denial of the motion for new trial. (Mot. Reconsideration of Denial of Mot. New Trial, Record Appendix at 50; Mem. Supp. Amended Mot. New Trial, Record Appendix at 51.) The memorandum made all the pertinent arguments Ely presents here. The motion was supported by an affidavit dated May 14, 1985, of an attorney by the name of Lawrence McGuire ("McGuire"). McGuire had represented Ely on unrelated state court charges that Riley was also prosecuting at the same time that the charges that are the subject of the instant case were proceeding. (Mem. Supp. Amended Mot. New Trial at 1; McGuire Aff. ¶ 2, Record Appendix at 186.) McGuire stated in his affidavit that he "learned that the murder charge was going to trial and that the Co-defendant, one David Gosselin, had pled to the lesser included charge of manslaughter, received a twenty year Concord sentence, on the condition that he testify against the Defendant." (McGuire Aff. ¶ 5.) He did not specify from whom or

---

10. Of course, the jury had also heard the neighbor's testimony that it was Ely who threatened David Schrempf two weeks before the fire. The threat, however, was supposedly made in Gosselin's presence, but Gosselin denied that the incident ever occurred. Assuming the threat was made, two possibilities, among others, immediately come to mind: either Gosselin had forgotten it, or he lied when he said he could not recall it. One possible motive he might have had for lying was that it was Ely's threat that gave Gosselin the idea to set fire to the house with the Schrempf boys inside. It was for the jury, of course, to decide what to make of Gosselin's contradiction of the neighbor's testimony, and I propose no finding on this matter.

when he had obtained this information.[11]

By the time Hodgdon filed his motion for reconsideration, Riley had left the Essex County District Attorney's office and had gone into private practice. Assistant District Attorney Lila Heideman ("Heideman"), who had handled the direct appeal, was assigned responsibility for dealing with the motion Hodgdon had filed on Ely's behalf. By letter dated December 19, 1985, a copy of which was sent to Riley, Heideman advised Hodgdon that she had "informed [Riley] of the accusations the defendant is making against him." (Letter from Heideman to Hodgdon of 12/19/85, E.H. Ex. 13.) She went on to tell Hodgdon that "the Commonwealth intends to have Mr. Riley testify," if the matter reaches "the hearing stage," and that she had been in touch with Riley regarding his availability. (Id.) That same day, Heideman sent Riley a letter in which she thanked him for his cooperation; advised him that she had informed Hodgdon regarding his schedule; and stated:

> I wanted to enclose the material the defendant has filed in the above case. You should especially note the affidavit from Lawrence McGuire.

(Letter from Heideman to Riley of 12/19/85, E.H. Ex. 12.) The word "Enclosures" appeared at the bottom of the letter.

On June 19, 1986, after she had spoken to Riley about "the accusations defendant is making against him," had forwarded to Riley defendant's filings and specifically called to his attention McGuire's affidavit, and had made the decision that she would call Riley as a witness if the court were inclined to schedule an evidentiary hearing, Heideman filed a memorandum in opposition to the motion for reconsideration. (Commonwealth's Mem. Opp. Def.'s Mot. for Evid. Hearing and Mot. for Reconsideration of Mot. for New Trial, Supplemental Record Appendix, Tab C.) The memorandum correctly noted that Ely, in his original motion,

had claimed that Riley "failed to reveal the existence of an agreement for the testimony of David Gosselin, the chief Commonwealth witness." (Id. at 4.) It acknowledged that the motion for reconsideration included new evidence—McGuire's affidavit—as support for that claim, (id.), but it challenged McGuire's credibility by noting that McGuire "does not state from whom he learned 'of the condition'" and that he had never represented Ely in the murder case, (id. at 6). The Commonwealth's memorandum further acknowledged that, at trial, O'Neill had questioned Gosselin about "his denial of an agreement to being treated as a juvenile if he testified against the defendant," and that "[c]urrent defense counsel [Hodgdon] claims that David Gosselin committed perjury when he denied the existence of a promise in exchange for his testimony and that the prosecutor allowed the perjury to stand uncorrected." (Id.) The following statement (for which Heideman, to her credit, expressed remorse at the evidentiary hearing) then appeared in the memorandum:

> The defendant ... refuses to believe that there was no promise of juvenile treatment in exchange for [Gosselin's] testimony.

> [A]n examination of the record reveals that the issue of whether a promise had been made in exchange for David Gosselin's testimony was fully explored.... The defendant has not put forth any evidence whatsoever to contradict the denial of an agreement. A hearing is unwarranted.

(Id. at 6–7.)

Despite the new evidence presented by Ely, Heideman's argument that there was insufficient evidence even to warrant an evidentiary hearing carried the day. On June 19, 1986, the court entered the following order:

> contradiction at the evidentiary hearing that he received this page from McGuire in connection with an unrelated classification matter, after the SJC had decided his direct appeal. (4 Evidentiary Hearing Tr. at 27–32.) Ely also claimed that this was the first actual evidence that he had of any agreement—a claim that the Commonwealth disputes but which I have concluded is valid.

11. Evidentiary Hearing exhibit 14 is a page from McGuire's logbook; it includes an entry dated May 23, 1980. The May 23 entry states, in part: "It appears that this [i.e., the murder case] will be a trial, although Co–D has plead to manslaughter, got a 20 MCIC, on condition he testify." The entry does not indicate the source of McGuire's information. Ely testified without

Upon argument of counsel, examination of the memoranda submitted and the affidavit of one McGuire, and whereas it appears that the grounds advanced are that of prosecutorial misconduct (known perjured testimony of one Gosselin) and the averment of the affiant that he "later learned" constitutes hearsay from an undisclosed source (for example it could have been the movant) there are no valid grounds for either reconsideration of this court's denial *nor* grounds for any evidentiary hearing thereupon; consequently the within motion be and hereby is *DENIED*.

(Order Denying Mot. Reconsideration of Denial of Mot. New Trial, Record Appendix at 75.) It would take Ely another eight years to obtain the evidence he would need to "contradict the [Commonwealth's and Gosselin's] denial of an agreement."

On December 11, 1990, Ely filed another *pro se* motion for reconsideration of his motion for new trial. (Mot. Reconsideration of Denial of Mot. New Trial, In light of Subsequently Received Documents ("Second Mot. for Reconsideration"), Record Appendix at 76.) He claimed that, as the result of discovery in a civil action that had been filed against him by the Schrempf family in 1988, he had obtained new materials, including the transcript of Gosselin's sentencing hearing that had taken place in November 1979,[12] which confirmed his belief that there had been a plea agreement. (Def. Aff. Supp. of Second Mot. for Reconsideration at 3, Record Appendix at 79.) Ely again filed a memorandum that made all the pertinent arguments and cited all the appropriate federal and state cases. (Def.'s Mem. Law Supp. of Second Mot. for Reconsideration, Record Appen-

dix at 83.) The matter was referred to a Single Justice of the SJC. (SJC Docket in *Commonwealth v. Ely,* Case no. SJ–91–0129, Docket no. 38.) Appellate counsel, Harold Robertson ("Robertson"), was assigned to represent Ely. (*Id.,* Entry no. 4.) On May 12, 1993, Robertson filed a memorandum in the SJC for Suffolk County in which he requested that the Single Justice remand the matter to Superior Court for an evidentiary hearing on the issue of whether a plea agreement in fact existed and had been suppressed. (Def.'s Mem., Record Appendix at 98.) Robertson again made all the appropriate arguments and cited all the appropriate federal and state cases.[13]

On June 22, 1993, the Commonwealth, now represented by Assistant District Attorney Margaret Perry ("Perry"), filed its opposition. (Commonwealth's Mem. Opp. Def.'s Mot. for Leave to Appeal Denial of Post–Conviction Relief, Supplemental Record Appendix, Tab D.) It acknowledged that Ely was moving for a new trial "on the ground that the prosecutor failed to disclose that an agreement was made between Gosselin and the Commonwealth to permit him to plead guilty to manslaughter and receive lenient treatment in exchange for testimony against the defendant." (*Id.* at 9–10.) In response, the Commonwealth argued that, because Gosselin had denied at trial (and at Ely's transfer hearing) that there had been a plea agreement, the matter was foreclosed unless Ely presented substantial new evidence to establish that Gosselin was lying. (*Id.* at 6.) The new evidence that Ely had presented, according to the Commonwealth, was nothing more than speculation and hearsay, and, therefore, was not sufficient to overcome Gosselin's sworn statement on two separate

---

12. Gosselin's November 1979 sentencing hearing in Superior Court must be distinguished from Gosselin's October 1979 probable cause and transfer hearing in District Court. Ely did not obtain the transcript of the latter until the evidentiary hearing was underway in this case.

13. For example, the memorandum filed by Robertson included the following passage:

There can be little doubt that if an agreement existed between David Gosselin and the prosecution, the prosecution had a duty to disclose it, *Giglio v. United States,* 405 U.S. 150 [92 S.Ct. 763, 31 L.Ed.2d 104] (1972) and a duty not to remain silent if the witnesses lied in

denying an arrangement. *United States v. Agurs,* 427 U.S. 97 [96 S.Ct. 2392, 49 L.Ed.2d 342] (1976). The duty extends to non-formal understandings between a witness and the prosecution. *See, e.g., Commonwealth v. Gilday,* 33[sic] Mass. 166, 415 N.E.2d 797 (1980). In this case, Ely said Gosselin did it. Gosselin said Ely did it. Given this duel of credibility, there can be little doubt that an agreement for leniency for Gosselin was material and capable of influencing the jury. *Commonwealth v. Collins,* 386 Mass. 1 [434 N.E.2d 964] (1982). (Def.'s Mem. at 4.)

occasions that he had not "receive[d] lenient treatment in exchange for testimony." (*Id.* at 10–12.)

The Single Justice conducted a non-evidentiary hearing on June 23, 1993. Robertson proceeded immediately to the central issue in the case: whether "the primary eyewitness against [Ely], one David Gosselin, had lied when he indicated that there had been no agreement made between Mr. Gosselin and the prosecution in exchange for that testimony." (Single Justice Hearing Tr. at 1, Supplemental Record Appendix, Tab E.) The Single Justice acknowledged that Gosselin's testimony was "very important to the Commonwealth," (*id.* at 4), but asked the central question that the Commonwealth (although a party to the agreement) had been raising in opposition to Ely's post-trial motions since 1985: "What is the evidence that a promise had been made?" (*Id.* at 1.) Robertson cited the McGuire Affidavit, but the Single Justice noted, correctly, that "Larry McGuire doesn't pretend to have heard any promise that's made. He's just come to a conclusion based on something or other." (*Id.* 1.)

The Commonwealth did not dispute that Gosselin had denied that an agreement existed.[14] Instead, notwithstanding that it was itself a party to the plea agreement, it argued, *inter alia*, that there was insufficient evidence that any agreement existed. It continued to press the point that, in order to overcome Gosselin's unequivocal denial of an agreement, Ely had to come forward with non-hearsay, non-speculative evidence to the contrary, and the McGuire affidavit and other circumstantial evidence that Ely had mustered did not satisfy that demanding standard. The Commonwealth, in short, continued to rely upon and take advantage of Gosselin's perjury as the focal point of its opposition to Ely's motion for a new trial.

At that point in the hearing, the Single Justice posed a hypothetical question that would prove to be prophetic: Would a new

trial be warranted, he asked, if Gosselin's own counsel provided an affidavit that said, "I talked with Assistant District Attorney so and so and we made an agreement. He said and I said, he said and I said, and we had a deal, that if my client testified, that the government would go easy on my client. Now, I know my client testified differently, but—:" (*Id.* at 6.) Perry interjected: "Right, so I suborned perjury, as did the Assistant," thus showing that she well understood the significance of the hypothetical. (*Id.*) The Single Justice continued: "[W]e might be in trouble then, wouldn't you think?" (*Id.*) Perry correctly responded that, if such an affidavit were produced:

[D]efense counsel [would] be saying that he essentially understood that perjury was being committed, and that the Assistant District Attorney did, ... *this is such egregious conduct that the case must be reopened to examine to see what its effect, if any, it had.*

(*Id.* at 7) (emphasis added). Perry promptly added, however, that it is one thing to talk about a hypothetical affidavit from a party to an agreement confirming that an agreement in fact existed, and quite another to argue, as Robertson was doing, that the McGuire affidavit and other circumstantial evidence was sufficient to raise the kinds of concerns that the Single Justice and she were discussing. She said, "[T]he issue for the court is ... given the evidence, is there anything here that substantially calls into question the fundamental reliance [sic] of the evidence that was presented to the jury. And it's the Commonwealth's position that this does not...." (*Id.*)

The Single Justice took the matter under advisement and denied the motion the following day. (Order Denying Leave to Appeal, Record Appendix at 105.) He also denied Ely's motion for reconsideration on July 20, 1993. (Order, Record Appendix at 111.)

14. In fact, the Commonwealth noted that Gosselin had *twice* testified under oath that there was no agreement—once at Ely's trial and once at Ely's transfer hearing, where, according to Perry, Gosselin, "a major witness," was "specifically asked" by the judge "if any agreements have been made, have any recommendations been made," and "again Gosselin said no." (*Id.* at 6.) The Single Justice concurred with Perry's interpretation of Gosselin's testimony, noting that "there's no question ... that Gosselin took the position that there was never any deal." (*Id.*) Gosselin's testimony cannot reasonably be read any other way.

Ely was undeterred by his latest loss. After listening to a tape recording of the hearing, he decided to attempt to obtain an affidavit of the type that was the subject of the Single Justice's hypothetical. (3 Evidentiary Hearing Tr. at 23–24.) By letter dated May 9, 1994, he wrote to Previte and asked for his "acknowledgement regarding that the pleas were agreed to prior to the hearing. That is that there was an agreement made prior to Gosselin's plea hearing for his testifying against (me) Arnold Ely." [15] (Aff. of Albert Previte, Jr., Esq. ¶ 13, Respondent's Mot. Expand Record, Item (2), Docket no. 48.) By return letter dated May 17, 1994, Previte sent Ely not just an acknowledgement, but a copy of the actual, hand-written plea agreement, (E.H.Ex. 1A), that he and Riley had executed on October 31, 1979. (*Id.* at ¶ 14.) In reliance on this new and irrefutable evidence, Ely filed another *pro se* motion, affidavit, and memorandum in Superior Court in which he asked for a new trial and made all the appropriate arguments and cited all the proper cases. (*See* Mot. for New Trial, Record Appendix at 112; Aff. Supp. Mot. New Trial, Record Appendix at 116; Mem. Law Supp. Mot. New Trial, Record Appendix at 119.) He attached to his affidavit a copy of the actual plea agreement.

Despite the colloquy that had taken place between the Single Justice and Perry a year earlier, in which Perry had acknowledged that the situation would be different and "egregious" if there were credible evidence that perjury had been committed or suborned, the Commonwealth filed a motion for summary denial of Ely's latest motion on the ground that all this had been heard and rejected before by both the Superior Court and the Single Justice of the SJC. (Commonwealth's Mot. Summary Denial of Latest Mot. for New Trial, Supplemental Record Appendix, Tab F.) To underscore its false claim that this was old hat, the Commonwealth supported its motion for summary denial with a copy of the memorandum it had filed a year earlier with the Single Justice. There was not a hint of acknowledgement in the Commonwealth's filings that there was

anything new or different in Ely's latest motion or that Ely had, in fact, now met the Commonwealth's decade-long challenge to produce credible evidence that the Commonwealth's key witness had lied.

Ely filed an opposition to the Commonwealth's motion for summary denial of his motion for new trial. (Def.'s Mot. Opp. Commonwealth's Mot. for Summ. Denial, Record Appendix at 129.) He attempted to correct the false impression conveyed by the Commonwealth's motion by accurately pointing out, in the first paragraph of his opposition, that the plea agreement that he had attached to his papers "did not become available to the defendant until after the decision of the Single Justice of the Supreme Judicial Court of July 20, 1993." (*Id.* at 1.) The Superior Court judge nevertheless incorporated by reference the Commonwealth's demonstrably false claim that Ely's papers presented nothing new and, solely on that ground, summarily denied the motion. (Order Denying Mot. New Trial, Record Appendix at 132–133.) Ely sought leave from a Single Justice to appeal this latest denial, (Mot. Leave to App. Denial Mot. New Trial, Record Appendix at 134), and, as he had done below, he attached a copy of the plea agreement to his filings, (Aff. Supp. Mot. Leave to Appeal Denial Mot. New Trial, Record Appendix at 135). He again made all the appropriate arguments and cited all the proper cases. In an Order dated August 11, 1994, the Single Justice, without hearing or comment, denied leave to appeal. (Notice of Docket Entry, Record Appendix at 144.)

Ely, acting *pro se*, filed this, his first and only, petition for writ of habeas corpus on February 27, 1995. (Habeas Corpus Petition, Docket no. 7.) He asserted four separate grounds in support of his petition: (1) the prosecutor suppressed exculpatory evidence (the plea agreement); (2) the prosecutor failed to disclose Gosselin's perjury about the nonexistence of the plea agreement and used it to his advantage; (3) the prosecutor's closing argument was misleading because it relied upon Gosselin's perjured testimony; and

---

**15.** Ely apparently requested an affidavit rather than a copy of the actual agreement because, until Previte sent him a copy of the written agreement, he had assumed that the agreement was oral. (3 Evidentiary Hearing Tr. at 111.)

(4) suppression of the plea agreement deprived Ely of his right to confront and cross examine witnesses against him. (*Id.* at 4–5.) [16] The Commonwealth filed an answer (Amended Answer, Docket no. 37) and a motion to dismiss (Respondent's Mot. Dismiss and Opp. Petition, Docket no. 39), supported by a lengthy memorandum, (Mem. Law Supp. Mot. Dismiss, Docket no. 44). In its memorandum, the Commonwealth acknowledged, for the first time. that there was a plea agreement but, despite denying its existence for over ten years, made the claim that the agreement "was certainly not a secret." (Mem. Law. Supp. Mot. Dismiss at 17.) [17] It also argued that Ely had procedurally defaulted and failed to exhaust remedies available under state law and that the agreement was not material. Counsel was appointed for Ely and a five-day evidentiary hearing was conducted over a three-month period ending in July 1996. The primary issues at the hearing were whether the plea agreement had been produced and the related questions of whether the plea agreement was material and whether Riley had a duty to disclose Gosselin's perjury to the trial judge. Subsequently, both sides filed lengthy post-hearing memoranda and reply memoranda, including proposed findings of fact and conclusions of law.

## III. PROPOSED FINDINGS REGARDING DISPUTED ISSUES

### A. Was the Plea Agreement Produced?

The overriding issue at the evidentiary hearing was whether the plea agreement had been produced by the prosecution prior to trial. For reasons set forth below, the evidence was clear and convincing—indeed, upon reflection, overwhelming—that the agreement was not produced. Before I state the basis for my proposed finding, however, I should deal with two preliminary matters.

First, when I refer to the "plea agreement," I am referring to the written plea agreement dated October 31, 1979, which includes the all-important *quid pro quo* that Gosselin must testify in the case against Ely in order to receive a lenient sentence. I emphasize this point because it is apparent from the Commonwealth's many post-petition filings that the Commonwealth, surprisingly, is still under the mistaken impression that the agreement we are concerned about is the Commonwealth's agreement to recommend a lenient sentence in exchange for Gosselin's agreement to plead guilty to reduced charges.[18] There has never been any

**16.** Although the petition purports to assert four separate grounds, it may readily be seen that there are in substance only two: (1) Riley suppressed exculpatory evidence (the plea agreement), which necessarily impaired the effectiveness of Ely's cross examination of Gosselin, and (2) far from correcting the record when Gosselin falsely denied that an agreement was made, Riley used Gosselin's perjury to his advantage to obtain a conviction.

**17.** Although the Commonwealth, for ten years, had successfully dismissed McGuire's information as unreliable hearsay that was utterly unworthy of belief, it now cited Ely's "admi[ssion]" that "the prosecutor told Attorney Lawrence McGuire ... about [the agreement]," as proof of its claim that the agreement "certainly was not a secret." (*Id.*) Putting aside the Commonwealth's inconsistency, the important point, as discussed below, is that the Commonwealth violated its obligation to provide the physical agreement itself, without which Ely could not effectively prove that Gosselin was lying. Then, to compound the problem, the Commonwealth not only failed to correct Gosselin's false testimony, but it implicitly relied upon it when, in closing argument. Riley asked the following rhetorical questions: "[W]hy would [Gosselin] come in here after his case is over, after he's been sentenced, why would he come in here and tell you that Arnold Ely did what he told you he did? What has he got to gain by telling you anything but the truth?" (4 Ely Trial Tr. at 528.)

**18.** For example, the Commonwealth points to contemporaneous newspaper accounts of Gosselin's change of plea hearing in Superior Court in November 1979. Those articles report Gosselin's change of plea and the Commonwealth's recommendation for a lenient sentence, but they make no mention of a plea agreement between Gosselin and the Commonwealth whereby Gosselin agreed to testify in the case against Ely in exchange for a lenient sentence. *See* Ira Chinoy, *Haverhill youth, 17, pleads guilty to arson, manslaughter, Lawrence Eagle Tribune,* Nov. 30, 1979, at 43, Mot. Expand the Record at (2), Docket no. 48 (discussing Gosselin's guilty plea without mentioning Gosselin's agreement to testify); *Haverhill teen indicted in fatal Newburyport fire,* Jan. 10, 1980, at 7, Mot. Expand the Record at (2) (discussing Ely's indictment and Gosselin's plea and suggesting Gosselin was given a juvenile sentence because he had been diagnosed as emotionally retarded).

dispute that it was known long before Ely's trial that Gosselin had pleaded guilty to manslaughter and arson and that, in exchange, the Commonwealth had recommended a relatively lenient sentence. What was *not* known, however, and what the Commonwealth, until recently, consistently denied, was that the sentencing recommendation was expressly conditioned on Gosselin's agreement to testify.

Second, when I refer to the "plea agreement," I am not including the "assurances" that Riley gave Previte and Gosselin at Gosselin's October 26, 1979 transfer hearing. This is not to say that I have concluded that those assurances did not constitute an inducement that should have been disclosed in the context of Ely's trial in September 1980. To the contrary, I believe, for reasons discussed below, that they did. The reason I do not give substantive significance to them is that Ely's habeas petition did not include the suppression of this evidence as a ground for relief, and the courts of the Commonwealth were never given an opportunity to consider it. That is not surprising, of course, since the Commonwealth did not disclose this evidence until the evidentiary hearing was underway in this case. To say that I do not attribute substantive significance to the Commonwealth's failure to disclose those assurances, however, is not to say that such failure has no evidentiary significance for such purposes as evaluating Riley's credibility and determining the extent of Riley's understanding in 1979 of his constitutional obligations.[19]

Turning, then, to the bases for my proposed finding that the Commonwealth did not disclose the plea agreement, I take the following evidence into consideration.

### 1. Shalhoub's Testimony

Shalhoub was Ely's court-appointed attorney from the time of Ely's arrest through the

probable cause and transfer hearing. He testified, credibly, that, to the best of his admittedly dim recollection, Riley never gave him a copy of the plea agreement or disclosed its existence. Shalhoub's recollection is strongly corroborated by circumstances. When Shalhoub cross examined Gosselin at the second day of Ely's transfer hearing, he tried repeatedly, as any competent attorney would have done, to get Gosselin to admit that the Commonwealth had provided him an inducement in exchange for his testimony against Ely. Gosselin repeatedly denied the existence of any inducement, going so far as even to deny being aware "that Mr. Riley can recommend that you be treated as a juvenile." (2 Ely Transfer Hearing Tr. at 137.)

Shalhoub reserved the right to recall Gosselin at the third day of Ely's transfer hearing on November 20, 1979. (2 Evidentiary Hearing Tr. at 15–17.) He elected not to do so. (*Id.* at 16.) Given the persistence with which Shalhoub cross examined Gosselin on this point on October 31, 1979, and given the highly suspicious circumstances of the agreement being signed immediately following Gosselin's testimony against Ely, it is difficult to imagine that Shalhoub would not have recalled Gosselin to cross examine him further at the November 20 hearing about the agreement, if Riley had disclosed it in the interim. Indeed, Shalhoub could not think of a reason why he would not have done so. (*Id.* at 16–17.)

### 2. O'Neill's Testimony

O'Neill has an unsavory past, including "a suspension from practice between 1972 and 1979 based on criminal convictions for forgery, uttering forged checks, and receiving stolen motor vehicles." *In re Paul F. O'Neill*, 9 Mass. Att. Discipline Rep'ts 253,

---

**19.** Because the petition does not seek relief based upon the Commonwealth's failure to disclose Riley's assurances, the petition is not a "mixed" one within the meaning of *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). For the same reason, Ely's failure to present this issue to the courts of the Commonwealth does not raise an exhaustion problem. Conversely, if Ely wants the court to give substantive and not just evidentiary consideration to Riley's failure to

disclose these assurances, the petition should be dismissed without prejudice to enable him to exhaust this unexhausted claim. *See Watkins v. Ponte*, 987 F.2d 27, 30 (1st Cir.1993) ("*Rose* require[s] that district courts entertaining mixed habeas petitions offer petitioners an explicit choice to proceed on exhausted claims or to delay Federal review to bring all claims once exhausted.")

253 (1993). If that were not enough, he was disbarred in 1993 for "convert[ing] to his own use funds received from a client as advance payment of legal fees." *Id.* at 255. He now lives in Maine and, for obvious reasons, is no longer practicing law.

Under persistent cross examination by the Commonwealth, O'Neill testified repeatedly that there is not the slightest doubt in his mind that the plea agreement was not produced or disclosed. (5 Evidentiary Hearing Tr. at 58–61, 75, 80–84, 92, 94.)[20] Although one might be tempted to dismiss his testimony as self-serving, I do not. In the first place, O'Neill has no motive to lie or to risk perjuring himself—he has no stake in the outcome; he is no longer practicing law or even living in Massachusetts; he has considerable respect for Riley, (*id.* at 69); and he himself was the target of a complaint that Ely had filed with the Board of Bar Overseers, (*id.* at 117).

More important, whatever character flaws O'Neill has, I have no reason to believe that he was not a competent and tenacious attorney. In his cross examination of Gosselin at trial, he used every device at his disposal in his unsuccessful effort to get Gosselin to admit that there was a plea agreement, until, finally, the trial judge directed him to "get off that." O'Neill is certainly not the kind of attorney who would set a witness up for impeachment, as he so effectively had done, and then not expose the witness's lies, assuming he had irrefutable impeachment evidence such as a copy of an actual plea agreement whose existence the witness had denied. In this case, use of the agreement for impeachment would have been doubly effective, because it would have shown not only that Gosselin had lied when he denied that the agreement existed, but that he also had (and, worse, tried to conceal) a motive to lie about Ely's guilt. The fact that a combative attorney such as O'Neill did not use the plea agreement for this purpose persuades me that O'Neill was telling the truth.

The Commonwealth responds, not surprisingly, that O'Neill is such a scoundrel that nothing he says is credible. For reasons already stated, however, it is not just O'Neill's testimony that persuades me he is telling the truth (although, as noted, he has no obvious reason to lie), but the historical record of what occurred at the trial in September 1980. The Commonwealth replies that the historical record is ambiguous and that there was, indeed, a subtle reason for O'Neill not to attempt to use the plea agreement to impeach Gosselin. The reason was that, if O'Neill had used the plea agreement, it would have opened the door to the Commonwealth's use, as prior consistent statements, of Gosselin's statements to the police on September 15 and 16, 1979.

The Commonwealth's reply is not persuasive. In the first place, Gosselin's statements are not sufficiently damaging to Ely's case to keep O'Neill from impeaching Gosselin with the plea agreement. By September 15, 1979, Gosselin had already been arrested on the strength of the Tremblay statement. Thus, he already had some motive to make false accusations against Ely at the time he made his prior consistent statements. Moreover, it defies common sense to suggest that O'Neill would have questioned Gosselin about the subject of a possible plea agreement at all, if he did not intend to use the plea agreement to impeach him, if necessary. After all, if Gosselin had readily admitted the existence of an agreement in response to one of O'Neill's questions, he, O'Neill, would equally have opened the door to the use of Gosselin's earlier statements to the police as prior consistent statements. Thus, the time for deciding whether it was worth taking the risk of opening that door was at the time the decision was made to raise the subject at all, not after Gosselin had denied that the agreement existed. Once O'Neill made the decision to open the door to the subject by questioning Gosselin about it, he had nothing to gain and everything to lose by not im-

**20.** At one point, it appeared that O'Neill might have been on the verge of volunteering that it was possible that Riley's memory was better than his on this point. We will never know what O'Neill would have said, however, because the Commonwealth itself cut him off before he had completed his statement, on the ground that no question was pending. (5 Evidentiary Hearing Tr. at. 108.) Even if he had made such concession, however, it would not have undermined the certainty with which he denied any prior awareness of the agreement.

38

peaching Gosselin, after Gosselin had denied under oath that any agreement existed. As it was, O'Neill's decision to question Gosselin about an agreement produced a worst case scenario. It permitted Gosselin to give unrefuted and unrefutable testimony that "no agreement was made," and it gave Riley the opening he needed to argue in his closing that Gosselin had no reason to lie about Ely's guilt. O'Neill was far too astute to allow that to happen, if he could have prevented it. For these reasons, I conclude that O'Neill would surely have used the agreement for impeachment, if he had it in his possession.

### 3. Ely's Testimony

Ely testified that he worked closely with O'Neill in preparing the case for trial; that he reviewed O'Neill's case file before and during trial and knew what it contained; that his first pre-trial review of the case file took place in June 1980, several months after the February 22, 1980 deadline by which Riley had agreed to provide exculpatory evidence; that O'Neill's case file did not contain a copy of the plea agreement; that he sat at counsel table with O'Neill during the trial; and that he would have said something to O'Neill at trial if there were a plea agreement in the case file that could have been used to impeach Gosselin. (4 Evidentiary Hearing Tr. at 16–22, 36–38. 55–58.)

The Commonwealth, predictably. argues that Ely's testimony should be dismissed as a self-serving attempt by a convicted murderer to rewrite history. The history of the case itself demonstrates, however, that Ely is the type of defendant who would have taken a keen interest in all aspects of his defense. Based on his persistence in pursuing this matter, the quality and thoroughness of his pro se pleadings, and his demeanor at the evidentiary hearing, I am persuaded that he would have made it his business to examine carefully all evidence produced by the Commonwealth, especially evidence which the Commonwealth itself has characterized as "exculpatory." I am therefore persuaded that he would have known about the plea agreement, if it had been produced, and that he would have objected strenuously at trial if his attorney had failed to use it to expose Gosselin's lies. The fact that he did not speak out at trial confirms that the agreement was simply not in the case file.

### 4. Riley's Testimony

Riley presented the only testimony supporting the Commonwealth's contention that the plea agreement was disclosed. Riley testified that he was sure that he disclosed the agreement. (2 Evidentiary Hearing Tr. at 69.) For at least five primary reasons, however, his testimony was not credible, or, at least, it was less credible than the testimony of witnesses such as Shalhoub, O'Neill, and, for that matter, Ely.

First, despite his apparent certainty, Riley conceded he had no specific recollection of disclosing the agreement to Ely or his attorneys, and, as noted, there is no written evidence that he did. His entire basis for claiming that he had turned over the plea agreement was set forth in his affidavit dated January 25, 1996, in which he stated:

> Although I have no specific memory of providing this particular plea agreement with David Gosselin to defense counsel, it was my unvaried custom and practice to provide such plea agreements to defense counsel in pre-trial discovery, and I have never made an exception to my custom and practice.

(Riley Aff. ¶ 11, E.H. Ex. 5.)

When Riley was questioned at the evidentiary hearing about his affidavit, however, he conceded that he had never had another case, as a prosecutor or defense counsel, in which one defendant testified against another pursuant to a plea agreement, oral or written. (3 Evidentiary Hearing Tr. 54; 5 Evidentiary Hearing Tr. at 46.) The admission that he had no other experiences with plea agreements, before or since, completely undermines his claim that he knows the agreement was provided in this case because it was his "unvaried custom and practice" to provide plea agreement to defense counsel. The fact that he would make such a misleading statement in an affidavit also raises serious con-

cerns about his credibility and judgment.[21]

Second, undisputed facts in this very case establish that Riley had a misunderstanding of the scope of his disclosure obligations under cases such as *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), or, worse, that he was willing to disregard those obligations. Thus, Riley should have disclosed no later than February 22, 1980, the fact that, on October 26, 1979, he had given his "assurances" to Previte, in Gosselin's presence, that, contingent on Gosselin's "expected cooperation," "something can and will be worked out in the Superior Court," and that Previte, in Gosselin's presence, had stated. "I think we have reached a tentative agreement." *See, e.g., Giglio*, 405 U.S. at 155, 92 S.Ct. at 766 (where defendant's alleged co-conspirator is the key witness in the case, the government has an obligation to disclose "evidence of any understanding or agreement as to a future prosecution"); *Commonwealth v. Gilday*, 382 Mass. 166, 177, 415 N.E.2d 797, 803 (1980) (stating that "the prosecutor was not excused from his duty of disclosure by the lack of a formal agreement with the witness, nor is it dispositive that [the witness] was less than fully informed of any benefit to be gained"). Indeed, Riley would have had a disclosure obligation even if Gosselin had not been present. *Gilday v. Callahan*, 59 F.3d 257, 269 (1st Cir.1995) (disclosure of "understanding" between defense counsel and prosecutor "would have

permitted the jury reasonably to infer that, even if the 'wink and nod' deal had not been explicitly communicated to [the witness], he must have been given some indication that testimony helpful to the government would be helpful to his own cause"), *cert. denied*, —— U.S. ——, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996).

Riley's disclosure obligation was not excused by the fact that the plea agreement was not formally signed until after Gosselin had given his testimony at Ely's transfer hearing. Based upon Riley's statements on October 26, Gosselin and his attorney knew that Gosselin's testimony at Ely's October 31 transfer hearing would in effect be an audition. At a minimum, the jury might reasonably have inferred that Gosselin understood when he first implicated Ely under oath at Ely's transfer hearing that Riley would be unwilling to enter into a plea agreement unless Gosselin provided the cooperation that was expected of him. The jury might also reasonably have inferred that it was for this reason that Riley was unwilling to commit to a formal agreement until Gosselin had testified, and that Gosselin and Previte well understood this. Thus, the jury might have inferred that once Gosselin testified at Ely's transfer hearing under pressure to please Riley, he was locked into a version of events from which he could not deviate at Ely's trial, at least not without fear that, at a minimum, he could be prosecuted for perjury.[22] The jury had a right to know all this

---

21. I am also concerned that Riley was not sufficiently forthcoming at the evidentiary hearing about his complete lack of experience with plea agreements. For example, when he was first asked whether he had ever made an exception to his "unvaried custom and practice," he responded, "Not to my knowledge.... I have never made an exception to that custom and practice." (2 Evidentiary Hearing Tr. at 68.) Later, when he was asked how many other such plea agreements he had dealt with, he responded, "I don't really think there were that many." (3 Evidentiary Hearing Tr. at 49.) It took further probing to get Riley to reveal what he should readily have conceded from the outset—that this was, indeed, his first and only experience dealing with a plea agreement.

22. Ely may also have had a right to know that, four weeks after Gosselin had testified against

him at Ely's transfer hearing, the sentencing judge told Gosselin:

> We have you in our clutches for the next five or six years. If you mess up at all during that time the system will put you away for so long that you'll be an old man by the time you get out—if you ever get out.

(Gosselin Plea Tr. at 26.) Someone as young, unsophisticated, and limited in intelligence as Gosselin was may well have understood this to mean that, if he did not testify at Ely's trial in a manner that was consistent with the testimony he had just given in Ely's transfer hearing, he would forfeit the benefits of the plea agreement and be sent to jail for life. Ely, at least, should have known these circumstances, so that he could cross examine Gosselin about his understanding and make whatever argument to the jury he wished to make, based upon Gosselin's answers.

when it was evaluating Gosselin's credibility at Ely's trial. The fact that Riley did not appreciate this, or, worse, that he did but still failed to disclose the exculpatory circumstances leading up to the signing of the plea agreement, raises substantial doubts about his overall credibility.

Third, Riley's credibility is further undermined by the fact that, at Ely's October 31 transfer hearing, Riley elicited testimony from Gosselin that he had made no "promises" to Gosselin. (2 Ely Transfer Hearing Tr. at 44.) Riley knew when he questioned Gosselin that he had indeed given personal "assurances" in Gosselin's present five days earlier that a deal would be worked out if Gosselin cooperated. (Gosselin Transfer Hearing Tr. of 10/26/79, at 38.) The line between the making of "promises" and the giving of "assurances" is exceedingly fine—too fine, in my opinion, to be drawn by a prosecutor truly concerned with his "overriding interest that 'justice shall be done.'" *United States v. Agurs*, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). Moreover, wherever the elusive line is properly drawn between "promises" and "assurances," it clearly was overstepped when Riley remained silent while Gosselin falsely testified in response to Shalhoub's follow-up questions that he had no understanding or expectation that a deal was in the offing.[23]

Fourth, I would have expected that an experienced attorney like Riley would have made a preemptive reference to the plea agreement in his opening statement at trial or in his direct examination of Gosselin, so that the jury would not think he had tried to conceal the agreement when its existence was inevitably disclosed on cross examination. The fact that he did not do so suggests that he was not anticipating that O'Neill would use it in his cross examination, which in turn suggests that he knew that the agreement had not been disclosed to the defense. Riley's failure to speak up to correct Gosselin's false testimony on cross examination that no agreement had been made is also consistent with the conclusion that Riley knew the agreement had not been disclosed.

Fifth, from 1985 to 1995, the Commonwealth consistently denied that any agreement had been made. More to the point with respect to Riley's credibility, documentary evidence establishes that the first such denial took place shortly after Heideman had "informed [Riley] of [Ely's] accusations," had sent Riley copies of Ely's filings, including McGuire's affidavit; and had made the decision to call Riley as a witness if there were to be an evidentiary hearing. Despite the fact that neither Heideman nor Riley had a clear memory of their conversations in December 1985, the evidence is clear that Heideman did indeed inform Riley of Ely's accusations.[24] At that point, Riley might have reacted in one of four ways. First, Riley might have admitted that an agreement had existed and been withheld, which would be dispositive of the present issue (and raise serious ethical problems for Heideman). Second, he might have told Heideman that an agreement existed but that he had produced it, in which case there would have been no reason for Heideman to deny the existence of an agreement, as she did in her memorandum in opposition. Third, upon hearing the accusation and reviewing the McGuire affidavit, Riley might

---

23. I will deal separately with Riley's failure to speak up when Gosselin made similarly false statements at Ely's trial.

24. Heideman testified that she had no memory of having had a substantive conversation with Riley about the specifics of Ely's allegations.
   Q. (by Commonwealth) Now, Ms. Heideman, did you at any time prior to filing your opposition ... speak with Mr. Riley concerning whether there was a cooperation agreement with David Gosselin ... ?
   A. No
   Q. How can you be sure?
   A. Because I never would have made a statement that there, that I didn't believe there was

a written agreement if Mr. Riley had told me there was, and he would have told me there was.
   Q. Why didn't you speak with Attorney Riley?
   A. I don't know. I keep asking myself that question.
(1 Evidentiary Hearing Tr. at 43–44.) It is important to note, however, that Heideman gave her testimony before the Commonwealth located and produced her December 1985 correspondence with Riley and Hodgdon, which correspondence indicates that Heideman had at least some limited conversation with Riley regarding the substance of Ely's "accusations." (Letter from Heideman to Riley of 12/19/85.)

have remained silent, which is the last thing one would expect him to do if he believed he had been falsely accused in court filings of serious misconduct. It would also be difficult to square Riley's silence with Heideman's decision to call Riley, if he was needed, as a witness to support her claim that there was no agreement. Finally, he might have denied the existence of the agreement, which would be consistent with Heideman's memorandum in opposition, consistent with Heideman's decision to call him as a witness, and inconsistent with the Commonwealth's present claim that the agreement was disclosed. Because only the last alternative is consistent with the known facts and with expectations about how Riley would have responded to Ely's allegations, and for all the other reasons given, that is what most likely occurred.

### B. *Did Riley Have a Duty to Expose Gosselin's Perjury?*

■ The Commonwealth cannot and does not dispute the fundamental proposition that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (footnotes omitted). The Commonwealth suggests, however, that Riley had no duty to disclose Gosselin's perjury here for three reasons: first, the defense was equally aware of it; second, properly construed, Gosselin's testimony was not false; and, third, there is no reasonable likelihood that Gosselin's perjury could have affected the judgment of the jury. In this section, I will consider the first two reasons, reserving the third reason for the discussion below regarding materiality and harmlessness.

■ Regarding the first claimed justification for nondisclosure, the Commonwealth is wrong as a matter of law that it had no duty to alert the court to Gosselin's perjury if the defense was equally aware of it. At least where, as here, the prosecutor takes advantage of the perjury to argue in his closing that the witness had no reason to lie, the government has a duty to disclose even perjury that is known to the defense. *DeMarco v. United States,* 928 F.2d 1074, 1075–77 (11th Cir.1991). In any event, this argument is of no assistance to the government here, in view of my finding that the Commonwealth never disclosed the agreement to the defense.[25]

The Commonwealth's second justification for nondisclosure—that Gosselin's testimony was substantially true—also rings hollow. It is based upon the view that, in Gosselin's mind, at least, there was no agreement because there was none when he first told the Commonwealth that he was willing to testify against Ely. (3 Evidentiary Hearing Tr. at 75–78.) In other words, the Commonwealth suggests that, in a sense, Gosselin was correct to believe that there was no *quid pro quo,* because Gosselin had expressed a willingness to testify against Ely before the Commonwealth had offered him anything specific in return.

Assuming it is true that Gosselin had expressed a willingness to testify against Ely even before the Commonwealth had made him a reciprocal offer of lenient treatment, the fact is that, by the time Gosselin testified at trial, an agreement had been made. Gosselin's testimony to the contrary was, therefore, clearly and unequivocally false. The court and jury had a right to know this. If Riley believed that the sequence of events leading up to the signing of the actual agreement demonstrated that Gosselin would have been willing to testify even without an agreement, he could have attempted to elicit such

---

**25.** The Commonwealth makes the frivolous argument that Ely concedes that he knew about the agreement. Ely concedes no such thing; he merely acknowledges the obvious—that the circumstantial evidence that an agreement existed was so strong that it was difficult for him to believe that an agreement did not exist. Ely's belief that an agreement must have existed is an entirely different thing, however, than his being

able to prove that an agreement existed. Because the Commonwealth did not produce the agreement, Ely was stymied in his effort to impeach Gosselin when Gosselin testified that there was no agreement and incapable of answering Riley's rhetorical question, "What has he to gain by telling you anything but the truth?" (4 Ely Trial Tr. at 528.)

testimony from Gosselin on redirect examination. If he had done so, the jury would then have been able to make its own assessment of Gosselin's credibility based upon a complete knowledge of all the facts. Because Riley chose to remain silent in the face of Gosselin's perjury, he deprived the jury of this opportunity and, in effect, usurped its role as factfinder with respect to Gosselin's credibility.

I therefore conclude that Riley had a duty to expose Gosselin's perjury, especially before arguing to the jury that Gosselin had no reason to lie.

## C. *Was the Plea Agreement Material?* [26]

■ A prosecutor of course has no duty to disclose immaterial facts. In a case in which it is alleged that the prosecutor relied on a witness's false denial of the existence of a plea agreement, the standard for determining materiality is "whether there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury. To put the question the other way around: can we say that no reasonable jury could have been affected by the undisclosed information?" *Gilday v. Callahan,* 59 F.3d 257, 269 (1st Cir.1995).

■ Applying this standard, the answer here, as it was in *Gilday,* "is fairly obvious," *id.,* and for much the same reasons that it was in *Gilday.* Gosselin had virtually confessed to Tremblay that he had committed first degree murder, and he knew that the Commonwealth was in possession of Tremblay's statement to that effect. Indeed, it was on the basis of that statement that the Commonwealth had charged him with delinquency by reason of murder and was attempting to get his case transferred to Superior Court where he could be tried as an adult. Under these circumstances, the fact that the prosecutor was willing to recommend a lenient juvenile sentence in exchange for Gosselin's testimony would have provided powerful impeachment evidence to the jury.

The impeachment evidence would have been especially powerful if, as a result of the disclosure of the plea agreement, the defense would also have been able to establish through cross examination that Gosselin believed when he first testified against Ely at Ely's transfer hearing that Riley's willingness to recommend a lenient sentence might depend on whether Gosselin implicated Ely at that time. The stakes for Gosselin, as they had been for the witness Fleisher in *Gilday,* "were substantial indeed if his testimony blaming someone else could secure his release entirely [or, in Gosselin's case, substantially] from criminal responsibility for a murder he had committed, his motivation to lie could not have been greater." *Id.* The parallels go even further, for here, as in *Gilday:*

> Disclosure of the deal in all likelihood would have reduced substantially, or even destroyed, [Gosselin's] credibility. Because the direct accusation of an accomplice is of more than minimal consequence in a case where the defense is that someone else was responsible for the charged crime, we think it at least reasonably likely that the suppression of this evidence could have affected the jurors' judgment. Presumably, the government agrees with this assessment; for what other reason would the prosecutor have gone to such lengths to keep the information from them?

*Id.* In sum, because the suppressed evidence bore directly on the jury's assessment of Gosselin's credibility, it was material.

## D. *Was the Failure to Disclose Harmless?*

■ It is not sufficient for Ely to establish that suppression of the plea agreement was material, in the sense that it might have affected the jury's judgment about Gosselin's credibility. *Gilday* teaches that Ely must also establish that suppression was not harmless, in the sense that, if the jury doubted Gosselin's credibility, the outcome of the trial might have been different. *Id.* In other

---

**26.** To the extent issues of materiality and harmlessness are deemed to be issues of law, *see Ouimette v. Moran,* 942 F.2d 1, 4 (1st Cir.1991) (materiality of facts withheld by prosecution presents "mixed question of fact and law"), the "findings" expressed in this and the following section should be deemed to be conclusions of law.

words, the court must also determine "whether the error was of such magnitude that it actually casts doubt on the integrity of the verdict." *Id.*

■ In *Gilday*, the answer was "no," because, "even if the jury had assigned no weight to Fleisher's testimony, the substance of the case against Gilday would have remained the same" and the other evidence against the defendant "was considerable." *Id.* at 269–70. The opposite is true here. Without Gosselin's testimony, it is highly doubtful that the remaining evidence would even have been sufficient to support a conviction. In any event, if the jury disbelieved Gosselin, the prosecutor's task of persuading the jury that Ely, rather than Gosselin, set the fire would have been immeasurably more difficult.[27] For this reason, this case much more closely resembles *Giglio*, the case cited for comparison by the First Circuit in *Gilday*. *Id.* at 270. In *Giglio*, as here, "the government's case depended 'almost entirely' on [the testimony of a] witness whose deal with [the] prosecution was not disclosed." *Gilday* at 270 (citing *Giglio*, 405 U.S. at 154–55, 92 S.Ct. at 766); *see also Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1179, 3 L.Ed.2d 1217 (1959) (when the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure or deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice, even "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears"). Given the overriding importance of Gosselin's credibility to the outcome of the trial, the suppression of the plea agreement and Riley's failure to disclose Gosselin's perjury were certainly not harmless.

## IV. *LEGAL CONSIDERATIONS*

The Commonwealth, at various stages of this habeas case and with varying degrees of conviction, has argued that Ely's petition should be denied because: (1) the evidence was sufficient to support a conviction, (2) Ely procedurally defaulted; (3) Ely failed to exhaust state remedies; and (4) deference is owed to the denial of Ely's motions for new trial at the state court level. None of these arguments warrants extensive discussion.

The fact that the evidence at trial was sufficient to support the conviction is irrelevant. The issue is not what the jury could permissibly have concluded if it had heard the exculpatory evidence; it is whether there is any reasonable possibility it would have acquitted or returned a verdict of something less than murder in the first degree if it had heard it. *Gilday*, 59 F.3d at 269.

■ The argument that Ely committed procedural default by failing to raise at trial or on direct appeal the fact that the Commonwealth suppressed the plea agreement is unfathomable. It appears to be based on the fact that the defense did not object at trial or on appeal to the Commonwealth's failure to disclose the plea agreement.[28] But if the Commonwealth, in violation of its constitutional obligation, failed to produce the plea agreement and then, adding insult to injury, failed to speak out when Gosselin falsely denied its existence, the defense was fully justified in assuming that, appearances to the contrary notwithstanding, no agreement existed. In any event, as a result of the Commonwealth's breach, the defense had no evidence upon which to base an argument at trial or on direct appeal that the Commonwealth had committed constitutional error.

---

**27.** Indeed, the error would not be harmless even if there were a reasonable possibility that the jury's disbelief of a portion of Gosselin's testimony would have resulted in its return of a verdict of murder in the second, rather than first, degree. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *see also United States v. Brandon*, 17 F.3d 409, 455 (1st Cir. 1994) ("*Brady* requires the government to disclose any exculpatory evidence that is material to guilt or to punishment.") (internal quotation marks omitted).

**28.** One variation of this argument is that the government disclosed the plea agreement, but the defense committed a procedural default when it decided, for tactical reasons, not to impeach Gosselin with it. In view of my finding that the Commonwealth did not disclose the plea agreement and that the defense had, at most, an intuitive sense that a deal had been made, there was and could have been no procedural default on this theory.

Although all this seems self-evident, the Commonwealth nevertheless insists that Ely forfeited his right to complain because he did not do so prior to the affirmance of his conviction on direct appeal. The Commonwealth seems to believe, in other words, that, once the SJC affirmed the conviction, it was too late for Ely to challenge it on the ground that it was obtained through perjury or the suppression of exculpatory evidence. That is not the law; nor, for obvious reasons, should it be. To reward the government for it, skill in keeping exculpatory evidence suppressed through the date of affirmance would only encourage abuse. *See, e.g., Julius v. Jones,* 875 F.2d 1520, 1525 (11th Cir.1989) (holding that the procedural bar is not applicable when the prosecution fails to produce *Brady* material, because, if applicable, it would "reward the wrongdoer because he was not timely found out.")

■ The Commonwealth's exhaustion argument is similarly without merit. Beginning in 1984, Ely and his various attorneys repeatedly called to the attention of the state courts their belief that the Commonwealth had failed to produce a plea agreement and had obtained a conviction through the use of perjured testimony. For more than a decade, the Commonwealth suppressed all evidence of the plea agreement (to which, of course, it was a party and whose existence it now contends was disclosed) and successfully opposed Ely's motions on the ground that Ely's hearsay and circumstantial evidence was insufficient to warrant an evidentiary hearing. One need only read the transcript of the non-evidentiary hearing before the Single Justice in June 1993 to realize that there was no misunderstanding about the grounds for Ely's motion. Nor was there even a dispute about the legal sufficiency of those grounds. The dispute before the Single Justice, as it had been in Superior Court

since 1984, was whether the evidence that an agreement existed was sufficient to warrant a reopening of the proceedings. When, in 1994, Ely finally succeeded in obtaining a copy of the actual agreement, the Commonwealth continued its deception by taking the position that there was nothing new in Ely's pleadings, despite the fact, as the Commonwealth well knew, Ely's 1994 motion was based on new, extraordinary evidence of the very type that the Single Justice and Perry had agreed would warrant a reopening of the case. The fact that the Superior Court and the Single Justice of the SJC again denied relief was due not to Ely's failure to apprise those courts of the issues he was raising, but to the Commonwealth's pretense that nothing had changed since Ely's motions for new trial and for leave to appeal had last been denied. Perhaps if the Commonwealth had been more forthcoming at that point, it would not have become necessary for the federal court to intervene. But it is far too late for such "what ifs." Ely fairly apprised the courts of the Commonwealth of the nature of his claims, respondent must accept its fair share of responsibility for the failure by those courts to take appropriate remedial action.

Finally, the Commonwealth suggests that this court owes deference to the decision by the Superior Court to deny Ely a new trial and by the Single Justice of the SJC to deny Ely leave to appeal such denial. Assuming, without deciding, that the current version of the federal habeas statute applies to this proceeding, deference is owed to the decision of the courts of the Commonwealth to deny relief only if such denial was the result of an "adjudication on the merits" and was neither "contrary to ... clearly established Federal law" nor "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [29]

---

29. The current version of the federal habeas statute, as amended by Section 104 of Title I of the Antiterrorism and Effective Death Penalty Act of 1996, P.L. 104–132, 110 Stat. 1217, provides, in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated

on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts

It is doubtful that the denial of relief by the Superior Court and the Single Justice was an "adjudication on the merits," where the Superior Court denied relief without a hearing based upon the Commonwealth's clearly erroneous claim that Ely's 1994 motion raised no new issue, and the Single Justice, without comment and also without a hearing, denied Ely leave to appeal. Assuming, *arguendo,* that such denials were adjudications "on the merits," either they were "contrary to ... clearly established Federal law" (assuming, as is unlikely in the absence of any state court hearing or opinion, that Ely had succeeded in persuading the state courts that the agreement existed and had been suppressed) or they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (assuming, as is far more likely in view of the Superior Court's incorporation by reference of the Commonwealth's position, that the Superior Court remained unpersuaded of the now undisputed fact that an agreement existed, notwithstanding that Ely had attached a copy of it to his 1994 motion). In either case, no deference is due.[30]

## V. CONCLUSION AND RECOMMENDATION

For all the foregoing reasons, I conclude that the plea agreement was in fact suppressed; that the prosecutor violated his constitutional obligation to expose and not rely upon Gosselin's perjury (or, at least, false testimony); that the suppression of the agreement and Gosselin's false denial of its existence were material and not harmless; and that there was no procedural default or failure by Ely to exhaust state remedies. I therefore recommend that the Commonwealth's motion to dismiss be **DENIED.** I

further recommend that Ely's petition be **GRANTED** and that the writ be issued, unless the Commonwealth affords Ely a new trial within ninety days of this recommendation being accepted and becoming final.

## VI. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Jan. 27, 1997.

in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Although the instant petition was filed before the current version of the statute became effective, there is no need to decide whether the recent amendments are retroactive, because, even under the current version, which is less favorable to Ely than the former version, no deference is due here to the state courts' decisions to deny relief.

**30.** A different question would have been presented if the denials of relief by the state courts had

been based upon their conclusion that the plea agreement had been timely produced. It is clear, however, that the courts of the Commonwealth did *not* make such finding, since the Commonwealth never even argued in favor of that position until the case reached this court. It is therefore unnecessary for this court to consider the more difficult question whether such a finding by the Superior Court, if it had been made, would have been "unreasonable."